Cassius Marsellus CLAY, Jr., Appellant,

v.

**UNITED STATES of America, Appellee.**

**No. 24991.**

United States Court of Appeals Fifth Circuit.

May 6, 1968.

Rehearing En Banc Denied June 6, 1968.

*see 394 U S 310 — remand*

Chauncey Eskridge, George Pontikes, Chicago, Ill., Howard Moore, Jr., Charles Morgan, Jr., Atlanta, Ga., Marvin Karpatkin, Melvin L. Wulf, Eleanor H. Norton, New York City, for appellant.

Morton Susman, U. S. Atty., James R. Gough, Carl Walker, Asst. U. S. Attys., Houston, Tex., Albert T. Ghiorzi, Attorney, U. S. Dept. of Justice, for appellee.

Before COLEMAN, AINSWORTH and DYER, Circuit Judges.

AINSWORTH, Circuit Judge:

■ "It may not be doubted that the very conception of a just government and its duty to the citizen includes the reciprocal obligation of the citizen to render military service in case of need and the right to compel it." Chief Justice Edward Douglass White, Selective Draft Law Cases, 245 U.S. 366, 378, 38 S.Ct. 159, 161, 62 L.Ed. 349 (1918).

Cassius Marsellus Clay, Jr., also known as Muhammad Ali, heavyweight professional boxing champion of the world, was convicted after trial by jury on an indictment charging violation of 50 U.S.C. App. § 462, for knowingly and wilfully refusing to report for and submit to induction into the armed forces of the United States. Clay's draft case has been through practically every phase of selective service procedure, beginning with the date he registered on April 18, 1960, until he was ordered to report but declined to submit to induction on April 28, 1967, and was thereafter convicted by jury trial held on June 19, 20, 1967. On four different occasions he was classified 1–A (Available for military service) by his local board, twice by two different appeal boards (in Kentucky and Texas) and once by the National Selective Service Appeal Board (the Presidential Appeal Board). In every instance the vote of the boards was unanimous.

There has been no administrative process which Clay (Ali) has not sought within the Selective Service System, its local and appeal boards, the Presidential Appeal Board and finally the federal courts, in an unsuccessful attempt to evade and escape from military service of his country. Being entirely satisfied that he has been fairly accorded due process of law, and without discrimination, we affirm his conviction.

The pertinent but lengthy chronology of his case follows:

April 18, 1960—Clay (Ali) registered for selective service with Local Board No. 47, Louisville, Kentucky.

March 9, 1962—Registrant was classified 1–A by Local Board No. 47, Louisville, Kentucky.

March 26, 1964—Registrant was classified 1–Y as a result of a physical examination, as being not acceptable for induction in the armed forces and not qualified under current standards.

February 17, 1966—Registrant was reclassified 1–A by Local Board No. 47 Louisville, Kentucky, after having been considered by the Examining Station in accordance with current regulations and found fully acceptable for induction.

February 18, 1966—1–A classification notice was mailed to registrant. Clay (Ali) was furnished Special Form for Conscientious Objector (SSS Form 150).

February 28, 1966—Special Form for Conscientious Objector was filed by registrant with the local board. This was the first time such a claim had been made. Registrant requested a personal appearance before the local board in reference to the change of his classification from 1–Y to 1–A.

March 17, 1966—The local board granted a personal appearance before it by registrant and again classified him 1–A.

March 28, 1966—Registrant appealed the 1–A classification to the Kentucky Appeal Board.

May 6, 1966—The Kentucky Appeal Board reviewed the file de novo and tentatively determined that the registrant was not entitled to the 1–O, conscientious objector or lower, classification. The complete file was referred to the Department of Justice for an advisory recommendation as provided by Selective Service Regulations (32 C.F.R. § 1626.-25), and an investigation by the Federal Bureau of Investigation was requested by the Department.

August 23, 1966—Registrant filed a letter request with Local Board No. 47, Louisville, Kentucky, for reclassification to IV–D as a minister of the Lost Found Nation of Islam (Black Muslims).

August 23, 1966—The FBI investigation having been made, a special hearing was held in Louisville, Kentucky, to consider registrant's conscientious objector claim. The Hearing Officer reported his belief that the registrant was sincere in his conscientious objector claim.

November 25, 1966—The Department of Justice, Office of Legal Counsel, Conscientious Objector Section, recommended to the Kentucky Appeal Board that the request of the registrant for conscientious objector status be denied. Registrant was mailed a copy of the recommendation on November 29, 1966.

January 10, 1967—The Kentucky Appeal Board denied the requested conscientious objector claim and notified the registrant that he was classified 1–A.

January 12, 1967—Local Board No. 47, Louisville, Kentucky, reviewed the registrant's complete file but declined to reopen his classification. The board agreed unanimously that registrant was not entitled to the IV–D ministerial exemption.

January 19, 1967—Pursuant to the written request of General Lewis B. Hershey, the National Director of Selective Service, Local Board No. 47, Louisville, Kentucky, reopened and considered anew the classification, including the claim for ministerial classification, and after re-examining the registrant's file again classified him 1–A, and notice of classification was mailed to registrant.

January 26, 1967—Registrant appealed the 1–A classification and requested that the Appeal Board for the Southern District of Texas (the place of his current domicile at Houston, Texas) hear the appeal.

February 15, 1967—The Appeal Board for the Southern District of Texas classified registrant 1–A and returned his

file to Kentucky on February 20, 1967, after finding that no new information had been submitted relating to his conscientious objector claim, and having considered and rejected his claim for ministerial exemption.

February 24, 1967—The National Director of Selective Service, General Lewis B. Hershey, appealed the registrant's classification to the National Selective Service Appeal Board (the Presidential Appeal Board). (See 32 C. F.R. § 1627.1 for the authority of the National Director to do so.) Registrant could not file such an appeal because the regulations (32 C.F.R. § 1627.3) require that one or more members of the appeal board dissent from the classification before a registrant has such a right to file the appeal himself.

March 6, 1967—The Presidential Appeal Board unanimously voted to classify the registrant 1–A, and a copy of "Minutes of Action Upon Appeal to the President" was forwarded to the local board on March 14, 1967.

March 14, 1967—Local Board No. 47, Louisville, Kentucky, ordered the registrant to report for induction on April 11, 1967, at Louisville, Kentucky.

March 24, 1967—Registrant requested a transfer of induction to Houston, Texas, which was granted by Local Board No. 61 at Houston.

March 29, 1967—Local Board No. 61, Houston, Texas, ordered registrant to report to it on April 28, 1967, for delivery to the induction station.

April 28, 1967—Registrant reported for but declined to submit to induction on the grounds of his religious beliefs as a minister of the Islam Religion.

May 8, 1967—Registrant was indicted for violation of 50 U.S.C. App. § 462.

June 19, 20, 1967—Registrant was tried and convicted by a jury of the selective service violation for refusing to submit to induction, and sentenced to five years' imprisonment and a fine of

$10,000.[1] This is his appeal from the conviction and sentence.

Clay (Ali) has no prior criminal record and no previous charges or convictions for crime, other than minor traffic violations.

The registrant has, therefore, exhausted every administrative remedy provided by Selective Service. He has also fully pursued his rights in the United States courts, in a vain attempt to stop his induction before his trial and conviction in the present case.

In Kentucky, registrant, who is a Negro, filed suit in the United States District Court for the Western District of Kentucky to prevent his induction into the armed forces. In his suit he sought a declaration that the Universal Military Training and Service Act is unconstitutional on its face and as applied because of "systematic exclusion" of Negroes from membership on draft boards; also, for an injunction to restrain all draft boards in Kentucky from performing their functions until Negroes were appointed to boards in proportion to their ratio to the population. He sought to enjoin further classification and induction of Negroes until this had been accomplished. The District Court denied relief, holding that no evidence had been submitted and no contention made that Clay (Ali) had been deprived of any right of appeal or other administrative process of Selective Service; that there was no evidence that he had personally been singled out and subjected to punitive action or other discriminatory treatment by the System. The District Court said that the issues were not appropriate for judicial review until the registrant either submitted to induction or refused to submit to induction, at which time the issues could be raised either by habeas corpus or in defense to a criminal prosecution. The District Court also held that except in rare circumstances, not present here, it was not the function of the judiciary to enjoin the operation or enforcement of the Universal Military Training and Service Act. A stay of injunction pending appeal was refused. Muhammad Ali v. Breathitt, D.C., W.D.Ky., 1967, 268 F. Supp. 63. Registrant petitioned the Sixth Circuit for leave to appeal and for temporary restraining order pending appeal, which was denied, the Court taking cognizance of the District Judge's denial of a certification that immediate appeal was warranted and the denial of an order staying proceedings. (Unpublished opinion, 6 Cir., Docket No. 17787, March 28, 1967.) The Sixth Circuit, on April 17, 1967, denied registrant's application for an order staying orders of the District Court and for an injunction pending appeal. (Unpublished opinion, 6 Cir., Docket No. 17834.) On the same day, the Supreme Court denied registrant's application for stay of the order of the United States District Court for the Western District of Kentucky, for injunction pending appeal and denied leave to file a petition for mandamus. Muhammad Ali v. Gordon, 386 U.S. 1002, 87 S. Ct. 1365, 18 L.Ed.2d 451 (1967). Rehearing was denied by the Supreme Court on April 24, 1967, 386 U.S. 1027, 87 S.Ct. 1388, 18 L.Ed.2d 473. On the same day, the Supreme Court also denied petition for writ of certiorari to the Sixth Circuit. Muhammad Ali v. Gordon, 386 U.S. 1018, 87 S.Ct. 1376, 18 L. Ed.2d 457.

In Texas the registrant filed a similar suit in the United States District Court, Southern District of Texas, raising substantially the same legal contentions as those in the Kentucky suit. The District Court (Judge Hannay) denied relief and ruled that the selectee's remedy could only arise after the final step to-

---

1. The District Judge said in this regard: "Well, I am going to impose the maximum penalty because under the rules at the end of an appeal if it is reversed, why, of course it is nil. If it is affirmed it is then subject to motion to reduce, and I find that we get into problems when clemency is given at the time of sentencing and then following an affirmance there is another petition for clemency." (R. 277)

ward military induction and should he refuse this step, his remedy would lie in whatever defense he claimed in the criminal prosecution. The District Judge said that a second remedy available was that of habeas corpus in the event the selectee should take the final step toward military induction while claiming that his induction was illegal, unconstitutional and void. Muhammad Ali v. Connally, D.C., S.D.Tex., April 28, 1967, 266 F.Supp. 345.

The registrant appealed from the District Court decision. He also filed application to stay and for interim injunction pending appeal, which was denied by the District Judge. He then petitioned Judge John R. Brown of the Fifth Circuit (now Chief Judge) for injunction pending appeal, which was denied,[2] and the matter was then referred to a panel of this Court (Judges Gewin, Coleman and Simpson), which also denied the motion for stay and injunction pending appeal. (Unpublished order, 5 Cir., Docket No. 24714, May 11, 1967).

After refusing induction on April 28, 1967, appellant filed another suit in the United States District Court, Southern District of Texas, on April 29, 1967, for similar relief, which was denied on May 1, 1967 by Judge Seals for substantially the same reasons assigned by Judge Hannay in the prior case, the District Judge being of the opinion that the subsequent refusal of induction did not suffice to create a remedy for injunctive relief. At the same time an application for a stay and for an interim injunction to the District Court pending appeal was also denied. A panel of the Fifth Circuit (Judges Gewin, Coleman and Simpson), on May 11, 1967, thereafter denied a motion for stay or injunction pending appeal of Judge Seals' decision. (Unpublished order, 5 Cir., Docket No. 24723.)

Appellant, having been indicted on May 8, 1967 for the selective service violation, then petitioned the Fifth Circuit for a writ of prohibition to restrain the impending trial, which petition was denied by a panel of this Court (Judges Tuttle, Washington and Simpson) on May 15, 1967. (See unpublished order, 5 Cir., in Docket No. 24750.)[3]

We summarize the principal questions for decision as follows:

1) Was the selective service induction order to appellant invalid because of alleged systematic exclusion of Negroes from draft boards?

2) Did the District Court err in refusing to grant appellant's request for the production of certain documentary and other evidence?

3) Was there a basis in fact for the denial to appellant of a ministerial exemption?

4) Was there a basis in fact for the denial to appellant of conscientious objector status?

---

2. Judge Brown in detailed reasons for his refusal (unpublished opinion) said in part:
 "I conclude that on traditional principles the equities—which includes the public interest—argue against such relief. I would not intimate what the intrinsic merits are—but I am convinced that the chances of success on appeal are so remote that I ought not to grant it.

 \* \* \* \* \*

 "Balancing these factors I do not think that the courts should intervene to test, on the application of every registrant, the statutory validity of the process. The law will not finally ever com-

pel the unlawful conscription of a citizen or permit criminal punishment for failure to submit to unlawful orders. That inconvenience, hardship or risk may be suffered if and until Congress prescribes other remedies—one of the perils of civilization and citizenship in a nation which calls on its citizens for the protection of its national and international interests."

3. The appeal to the Fifth Circuit from Judge Hannay's ruling (Docket No. 24714) was dismissed for want of prosecution on July 28, 1967; and the appeal from the ruling of Judge Seals (Docket No. 24723) was dismissed for want of prosecution on September 5, 1967.

5) Did the proceedings as a whole, selective service and judicial, constitute a prohibited bill of attainder?

## I.

## THE ALLEGED SYSTEMATIC EXCLUSION OF NEGROES FROM SELECTIVE SERVICE BOARDS

The Selective Service System is based on the constitutional provision which grants to Congress the power "To raise and support Armies. * * *" U. S. Const. art. I, § 8(12). The Universal Military Training and Service Act provides (50 U.S.C. App. § 460(b) (3)) that the President is authorized to create civilian local boards and appeal boards. Each local board shall consist of three or more members to be appointed by the President from recommendations made by the respective governors of each of the states. No member of any local board shall be a member of the armed forces but each member shall be a citizen residing in the local board jurisdiction. Appeal boards shall also be composed of citizens who are not members of the armed forces and consist normally of five members appointed by the President upon recommendation of the governor. The appeal board shall be a composite board representative of the activities of its areas and shall include one member from labor, one member from industry, one physician, one lawyer and, where applicable, one member from agriculture. (32 C.F.R. § 1604.22.)

Thus the racial composition of the local and appeal boards about which appellant complains, because of the absence of a proportion of Negroes in accordance with their ratio to the population, results from appointment by the President upon recommendation of the governor of each state. The appointments are therefore federal, not state.

There is also a National Selective Service Appeal Board (sometimes called the Presidential Appeal Board) composed of three members who are appointed by the President from citizens who are not members of the armed forces. This board acts for the President himself, being vested with the functions and duties of the President provided by the Act (50 U.S.C. App. § 460(b) (3)), which reads in pertinent part as follows:

"The President, upon appeal or upon his own motion, shall have power to determine all claims or questions with respect to inclusion for, or exemption or deferment from training and service under this title, and the determination of the President shall be final."

This board shall be in all respects independent of the Director of Selective Service. (32 C.F.R. § 1604.6(a), (b), (c).) It was stipulated in the present record that one of the three members of the Presidential Appeal Board was a Negro. However, there was no Negro member on any of the local or appeal boards which considered appellant's draft case.

According to the report of the National Advisory Commission on Selective Service (the Marshall Commission), in Kentucky, only 0.2% of 641 local board members is Negro, though 7.1% of the total population is Negro. In Texas, only 1.1% of local board members is Negro, though 12.4% of the total population is Negro. In the City of Louisville, the total population (1964) is 389,044, of which the white population is 310,717 and the Negro population 78,245, or 21% of the total population.[4] The Jefferson County, Kentucky, total population (1960) number 610,947, of which there are 532,057 whites and 78,350 Negroes, or 12.8% of the total population. In Harris County, Texas, of a total population of 1,243,158, 19.81%, or 246,351, is Negro.[5]

---

4. Appellant's brief asserts the Negro population of Louisville (1964) to be 78,327 and the percentage of Negroes to be 20.-1%—a slight error. The difference is, of course, not significant. See Special Censuses, Series P-28, No. 1377, Louis-

ville, Kentucky (United States Department of Commerce).

5. Appellant in brief supplies other calculations from the record as follows: 9.60% of the total population of the Western

According to the Marshall Commission Report, the unequal percentage of Negroes on draft boards was not peculiar to Kentucky, Texas or the South, but the imbalance was nationwide. Only in the District of Columbia and in Delaware were there substantial percentages of Negroes on the boards. In twenty-three states, there were no Negroes on draft boards, the Report stated.[6]

Nevertheless the Marshall Commission said significantly in its report, "There is no evidence that the variability of the Selective Service System leads to any systematic biases against poor people, or Negroes, insofar as the final proportion of men serving in the Armed Forces is a measure of this."

As a direct result of the Marshall Commission Report, the President in his message to the Congress on Selective Service dated March 6, 1967, instructed the Director of the Selective Service System to work with the governors "to assure that all local boards are truly representative of the communities they serve and to submit periodic reports on the progress in this area."

The Universal Military Training and Service Act in its congressional declaration of policy declares that the obligations and privileges of serving in the armed forces should be shared generally in accordance with a system of selection which is "fair and just" (50 U.S.C. App. § 451(c) ). The Act further provides (50 U.S.C. App. § 455(a) ) that "The selection of persons for training and service * * * shall be made in an impartial manner, under such rules and regulations as the President may prescribe, from the persons who are liable for such training and service and who at the time of selection are registered and classified, but not deferred or exempted: *Provided,* That in the selection of persons for training and service under this title * * *, and

in the interpretation and execution of the provisions of this title * * *, there shall be no discrimination against any person on account of race or color: * * *."

The Selective Service Regulations (32 C.F.R. § 1622.1(d) ) provide, "In classifying a registrant there shall be no discrimination for or against him because of his race, creed, or color, or because of his membership or activity in any labor, political, religious, or other organization. Each such registrant shall receive equal justice."

Appellant argues that the quoted statistics evidence racial exclusion in the composition of draft boards, in violation of the Fifth Amendment. He cites United States v. Jefferson County Board of Education, 5 Cir., 1966, 372 F.2d 836, 837, aff'd on rehearing, en banc, 380 F. 2d 385 (1967), cert. denied, sub nom. Board of Education of the City of Bessemer v. United States, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967), where this Court said that it has frequently relied on percentages in jury exclusion cases and in other civil rights cases for evidence of deliberate discrimination against Negroes. He concludes that if systematic exclusion of Negroes is constitutionally barred in the composition of juries, their exclusion in the Selective Service System likewise infringes his rights and requires a holding that draft boards, such as those in Kentucky and Texas which considered appellant's case, have no jurisdiction over appellant or in fact over any Negro. Thus he argues that the local boards have acted beyond their jurisdiction and may not act as to that class of registrants (including appellant) against whom it is claimed the appointing process has discriminated. Appellant concedes that considerable progress in rectifying this disparity in the several states has been made since the President's March 6, 1967, message to Congress on Selective Service, but

District of Kentucky is Negro; 14.25% of the total population of the Southern District of Texas is Negro.

6. For example, there were no Negroes on draft boards in such states as Indiana, Iowa, Kansas, Maine, Minnesota, New Jersey and Rhode Island.

contends that Negroes should not be selected in the future until the alleged systematic exclusion of members of that race from draft boards has ceased.

Appellant likens his classification and induction into the armed forces to a criminal prosecution because, as in a criminal prosecution, the Government restrains a registrant of his liberty and may even cause his death by sending him into combat.

■■ No court has held, so far as we can determine, nor do we here, that a Negro registrant for selective service is entitled to be classified and inducted by a selective service board composed of a percentage of Negro members which the Negro population bears to the total population, or that a board lacks jurisdiction of a registrant unless so constituted. No question is raised that the boards which considered appellant's classification were not regularly and properly constituted under appointment by the President, recommended by the governor. We do not justify the failure to include substantial numbers of Negroes on such boards. The Selective Service System must not only be fair, it must likewise have the appearance of fairness. Negro draftees should be selected for military service by a system which gives Negro citizens a full participation in the selection process. The Marshall Commission affirmed the necessity of greater participation by Negroes who are underrepresented as a class on local draft boards. The Commission said that the Negro's position in the military manpower situation is in many ways disproportionate, even though he does not serve in the armed forces out of proportion to his percentage to the population. The President in his March 6, 1967, message to Congress said in this regard: "The Nation's requirement that men must serve, however, imposes this obligation: that in this land of equals, men are selected as equals to serve. A just nation must have the fairest system that can be devised for making that selection." We concur with these remarks to the fullest. But nothing we have said justifies exemption from service in the armed forces for Negro registrants.

■ It is undeniable, as appellant contends, that conscription deprives an individual of his liberty and may even take his life. But we cannot properly compare the military draft to a criminal prosecution. There is no stigma attached to wearing the military uniform of the United States. To the contrary, it is a badge of the highest honor. Service under the flag of our country cannot properly be likened to imprisonment in a penitentiary. A proud nation with a long tradition of valor and bravery on the battlefield, with vivid memories in modern times of distant places some with unusual names, such as Chateau-Thierry, Normandy, Iwo Jima and Khe Sanh, where Americans have fought and died to preserve freedom, would never permit a comparison so odious. It is the same willingness of Americans to sacrifice their lives in the military service of the country which has made it possible to establish the United States as a free nation, and which has successfully warded off the encroachments of its enemies. "The knowledge that military service must sometimes be borne by—and imposed on—free men so their freedom may be preserved is woven deeply into the fabric of the American experience." President Johnson, Message on Selective Service to the Congress, March 6, 1967.

■■ The Government argues—and we agree—that a draft board system which does not have a sufficiently representative number of Negro members is comparable to a malapportioned legislature. The acts of such a legislature are not invalid and the laws which it passes are not null and void. The acts of a malapportioned legislature or local or county commission or board are acts of a de facto political authority and valid despite their failure to be apportioned in accordance with Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and Avery v. Midland County, Texas, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).

■ Nor is appellant's argument meritorious that composition of draft boards is similar to that of grand and petit juries. The right to trial by jury has specific constitutional authority. However, nothing in the Constitution or the Universal Military Training and Service Act requires racially proportionate selective service boards. It is not difficult to understand the reasons which support the prior rulings of the Supreme Court and this Court in the jury selection cases where convictions have been set aside for failure to have representative numbers of Negroes on jury venires. See Whitus v. State of Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); Rabinowitz v. United States, 5 Cir., 1966, 366 F.2d 34; Mobley v. United States, 5 Cir., 1967, 379 F.2d 768. The boards are administrative agencies with specific duties, many of them purely ministerial, which are provided for by the Act and Selective Service Regulations. A jury's verdict arrived at by secret deliberation has a finality which is not at all applicable to selective service classification and induction. As we shall see, draft board appeals are considered de novo and are not judicial proceedings.

■ The war powers of Congress to raise and support armies are constitutionally authorized and are of paramount public importance because they directly involve the protection and preservation of the nation itself. In this vital and sensitive area it behooves the judiciary to recognize the imperative necessity for the maintenance of the national integrity as upheld by the military forces of the United States. The Universal Military Training and Service Act provides that "every male citizen of the United States" between certain ages shall register and be subject to induction in the armed forces of the United States. Exemptions from service, such as for conscientious objectors or ministers of religion, are matters of legislative grace. United States v. Mohammed, 7 Cir., 1961, 288 F.2d 236, 242; Parrott v. United States, 9 Cir., 1966, 370 F.2d 388, 391. It has been long established that there is no constitutional right to exemption from military service by virtue of conscientious objection or religious calling. Wood v. United States, 5 Cir., 1967, 373 F.2d 894, 900, reversed on other grounds, 389 U.S. 20, 88 S.Ct. 3, 19 L.Ed.2d 20 (1967); George v. United States, 9 Cir., 1952, 196 F.2d 445, 449. These exemptions do not spring from the Constitution but from the Congress. George v. United States, supra. The Supreme Court said in Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 29, 25 S.Ct. 358, 362, 49 L.Ed. 643 (1905), that despite the liberty secured by the Fourteenth Amendment a person "may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country, and risk the chance of being shot down in its defense."

■ It will be recalled that there were seven different occasions on which appellant was classified 1–A: four by his local board, twice by two different appeal boards in Kentucky and Texas, and once by the Presidential Appeal Board. The appeals in each instance were considered de novo.[7] "It is universally held that the Appeal Board considers matters of classification *de novo* and its classification is one of first instance, not a mere affirmance or reversal of the Local Board, and that any * * * prejudice on the local level is cured by a fair

7. As to the appeal boards, the Regulations provide (32 C.F.R. § 1626.26):
"(a) The appeal board shall classify the registrant, giving consideration to the various classes in the same manner in which the local board gives consideration thereto when it classifies a registrant.

"(b) Such classification of the registrant shall be final, except where an appeal to the President is taken: * * *."
"The state appeal boards make a de novo classification." Comment, The Selective Service, 76 Yale L.J. 160, 171 (1966).

consideration on the appeal." DeRemer v. United States, 8 Cir., 1965, 340 F.2d 712, 719; United States v. Van Hook, 7 Cir., 1960, 284 F.2d 489, 491; Ayers v. United States, 9 Cir., 1956, 240 F.2d 802, 809, cert. denied, 352 U.S. 1016, 77 S.Ct. 563, 1 L.Ed.2d 548 (1957); Davis v. United States, 8 Cir., 1953, 203 F.2d 853. The action of the board of appeals completely supersedes the action of the local board in classifying appellant although the classification is the same. Cramer v. France, 9 Cir., 1945, 148 F.2d 801; United States v. Moore, 7 Cir., 1954, 217 F.2d 428, 431, 432. If the local board erred, the error was cured by the de novo action of the appeal board. United States v. Chodorski, 7 Cir., 1956, 240 F. 2d 590, 593.

The appeal to the Presidential Appeal Board was also de novo.[8] Any error or invalidity in the selective service procedures up to and including the Presidential Appeal Board was cured by de novo consideration by that board which acted in the place and stead of the President himself. One third of the membership of the Presidential Appeal Board (one of three) was a Negro, which is obviously a greater proportion than Negroes bear to the total population. The decision of the board was unanimous that appellant should be classified 1–A, which action thereby cleared the way for his induction into the armed forces. Nowhere in the record in this case or in appellant's brief do we find any specific charge or evidence of discrimination against appellant because he is a Negro. There are conclusory allegations that the absence of Negroes from local and appeal boards (other than the Presidential Appeal Board) in and of itself establishes discrimination. But we have been unable to find any evidence

which shows in the slightest particular that the treatment accorded Clay (Ali) by any board or member thereof was different from that given to any other registrant. Afforded every procedure known to the Act and the regulations, and an appeal to the Presidential Appeal Board to which he was not specifically entitled, appellant's refusal of induction and subsequent trial and conviction by a jury are the result of his own voluntary choice to violate the law of the land.

The contentions of appellant were given final and conclusive consideration by the highest tribunal within the System, a board entirely independent of the Director of Selective Service, and the decision was the same—that appellant be classified 1–A, thereby making him available for induction into the armed forces. The action of the Presidential Appeal Board, a board in which there was no racial imbalance, and the subsequent refusal of appellant to be inducted, are, without more, sufficient to affirm the conviction.

II.

DENIAL OF APPELLANT'S REQUEST FOR PRODUCTION OF CERTAIN DOCUMENTARY AND OTHER EVIDENCE

Prior to trial appellant sought discovery of certain evidence in connection with his allegation of systematic exclusion of Negroes from the System and racial discrimination against him. He moved the Court under Rule 16, Federal Rules of Criminal Procedure, that the Government produce all records of the National Advisory Commission on Selective Service showing the composition of draft boards in Texas and Kentucky and the details of the number of Negroes

8. The powers of the President upon an appeal (and necessarily of the Presidential Appeal Board which acts for him) are as follows (50 U.S.C. App. § 460(b)(3)):
 " * * * power to determine all claims or questions with respect to inclusion for, or exemption or deferment from training and service under this title

* * *, and the determination of the President shall be final."
"There is no personal appearance before the President's Board, which makes a de novo classification based on the materials in the registrant's file." Comment, The Selective Service, 76 Yale L.J. 160, 172 (1966).

and whites classified for service and exempt or deferred from induction, other records of the Mark Clark Commission on Selective Service to the House Armed Forces Committee, all of the files of Local Board No. 47, Louisville, Kentucky, relating to registrants who claimed and were granted exemptions, minutes of the meetings of the Presidential Appeal Board and Texas Appeal Board, the entire draft board file of appellant, and the White House transcript of a press conference by the President on March 9, 1967. He also moved to take the oral depositions of Lieutenant General Lewis B. Hershey, the National Director of Selective Service, Washington; United States Representative L. Mendell Rivers, Chairman, House Armed Services Committee, Washington; the members of the National Selective Service Appeal Board and the members of the Texas Appeal Board. General Hershey was requested to bring with him his notes about a public statement on January 31, 1967, in which he predicted appellant would not be deferred. Representative Rivers was requested to bring the notes of his public statement on August 25, 1966, relative to a statement that if Cassius Clay was deferred by the Louisville Board, "You watch what happens in Washington." The members of the National Selective Service Appeal Board were to bring all records and to be examined about the minutes of meetings and communications between them relating to appellant's hearing. The same information was to be obtained from the members of the Texas Appeal Board. Appellant also moved to take the depositions by written interrogatories of the Governors of Texas and Kentucky, the Selective Service Directors of those states, General Hershey, members of the National Selective Service Appeal Board, members of Local Board No. 47, members of the Texas Appeal Board and Representative Rivers. Another application sought issuance of subpoenas duces tecum to Lyndon B. Johnson, President of the United States;[9] Ramsey Clark, Attorney General; General Hershey; the Chairman of Local Board No. 47, Louisville, Kentucky; the Chairman of the Texas Appeal Board; the Director of the National Selective Service Appeal Board; Representative Rivers and the Executive Director of the National Advisory Commission on Selective Service, whereby these witnesses were to produce certain books, papers and documents in their possession called for by the subpoenas.

A mass of material was, therefore, sought by these discovery techniques. The Trial Judge held a hearing, received briefs and permitted oral argument as to whether the requested discovery should be granted. Appellant's basic contention was that the information sought was necessary to prove systematic exclusion of Negroes in the Selective Service System and that there was lack of procedural due process in the handling of his case. The Government objected to the requested discovery and moved to quash the subpoenas duces tecum, contending that what appellant sought was to put the Selective Service System itself on trial by a congressional-type general investigation. The Government argued against permitting such an investigation of the System, and also that the material sought was irrelevant to any issue which might arise in the criminal trial.

 The Government further contended that defense counsel was attempting to explore into the minds and mental processes of the administrative officers named in the subpoenas, was engaging in a "fishing expedition," and that much of the matter sought, though irrelevant, could be obtained from other sources. The District Court refused to order production of the discovery, documentary and other evidence sought by appellant. Nevertheless, much of it found its way into the record at the

9. The request for a subpoena to the President was subsequently withdrawn by appellant's counsel.

trial.[10] The measure of discovery permitted by the Rules of Criminal Procedure is not intended to be as broad as in a civil case. Fishing expeditions are the order of the day in a civil action but not in a criminal case for in the latter only limited discovery is permitted. United States v. Sermon, D.C.W.D.Mo.1963, 218 F.Supp. 871, 872, 873. A judge should, therefore, be sensitive to the rules of discovery, which are far more restrictive governing criminal discovery. Campbell v. Eastland, 5 Cir., 1962, 307 F.2d 478, 487. Application for relief under Rule 16, Federal Rules of Criminal Procedure, is a matter within the sound discretion of the Court and the controlling test is whether there has been an abuse of discretion. Gevinson v. United States, 5 Cir., 1966, 358 F.2d 761, 766; Beatty v. United States, 5 Cir., 1967, 377 F.2d 181, 185, reversed on other grounds, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967). We believe the District Judge's ruling was correct and that it was made in the exercise of reasonable discretion in the management of the proceeding. What the defense actually sought was to place the Selective Service System itself on trial by a broad, general, though vague and indefinite, investigation into its activities and procedures. Most of the evidence requested was immaterial to any defense which could be raised by appellant at his trial. The statistical information about the representation of Negroes on draft boards generally as well as in Kentucky and Texas was available from other sources and is in the record. It would have been grossly improper to place the members of the Presidential Appeal Board and the Texas Appeal Board on the witness stand to determine from them what their reasons were for the selective service classification which

they gave to appellant in this case. There was, therefore, no error in the ruling of the Trial Judge.

### III.

### DENIAL OF THE MINISTERIAL EXEMPTION

*Scope of Review.* In considering the propriety of appellant's classification, and the denial of a ministerial exemption and conscientious objector status, we must keep in mind that the Act provides that decisions of the local boards are final. (50 U.S.C. App. § 460(b)(3).) In the leading and much cited case of Estep v. United States, 327 U.S. 114, 122, 66 S.Ct. 423, 427, 90 L.Ed. 567 (1946), the Supreme Court said:

"The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant."

Therefore, the scope of review of local board decisions in draft cases is very limited and the range of review is the narrowest known to the law. Matyastik v. United States, 5 Cir., 1968, 392 F.2d 657; Blalock v. United States, 4 Cir., 1957, 247 F.2d 615.[11] In Blalock the Fourth Circuit said:

"The 'clearly erroneous' rule applied in equity appeals has no place here,

---

10. In the present record are the following: Registrant's entire Selective Service file, the Report of the National Advisory Commission on Selective Service showing the percentages of Negroes on local boards throughout the states of the nation, Minutes of the Presidential Appeal Board re-

lating to appellant's case, and the President's Message to the Congress on Selective Service dated March 6, 1967.

11. "The registrant who wants to take his case to court will find little relief from that quarter. Indeed, he will find it difficult to obtain review at all. The courts

nor even the 'substantial evidence' rule of the Administrative Procedure Act, 5 U.S.C.A. § 1009. Congress gave the courts no general authority of revision over draft board proceedings, and we have authority to reverse only if there is a denial of basic procedural fairness or if the conclusion of the board is without any basis in fact. Witmer v. United States, 348 U. S. 375, 75 S.Ct. 392, 99 L.Ed. 428; Goff v. U. S., 4 Cir., 135 F.2d 610."

◼ The courts do not sit as super draft boards, substituting their judgments on the weight of the evidence, nor should they look for substantial evidence to support such determinations. Tamarkin v. United States, 5 Cir., 1958, 260 F.2d 436, 437; Wood v. United States, 5 Cir., 1967, 373 F.2d 894, reversed on other grounds, 389 U.S. 20, 88 S.Ct. 3, 19 L.Ed.2d 20 (1967); Dickinson v. United States, 346 U.S. 389, 396, 74 S. Ct. 152, 157, 98 L.Ed. 132 (1953); Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955).

In recent cases we have consistently supported the "basis in fact" test in connection with the classification of draft registrants by local boards. See Wood v. United States, 5 Cir., 1967, 373 F.2d 894, reversed on other grounds, 389 U.S. 20, 88 S.Ct. 3, 19 L.Ed.2d 20 (1967); Greer v. United States, 5 Cir., 1967, 378 F.2d 931; Foster v. United States, 5 Cir., 1967, 384 F.2d 372; Jones v. United States, 5 Cir., 1968, 387 F.2d 909; Matyastik v. United States, 5 Cir., 1968, 392 F.2d 657.[12]

◼ *The Ministerial Exemption.* We turn now to the question of the denial of a ministerial exemption to appellant who claims to be a minister of the Lost Found Nation of Islam (Black Muslims). The Act provides that regular or duly ordained ministers of religion shall be exempt from service. (50 U.S.C. App. § 456(g).)

"The term 'regular minister of religion' means one who as his customary vocation preaches and teaches the principles of religion of a church, a religious sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister." (50 U.S.C. App. § 466(g) (2).)

See also 32 C.F.R. § 1622.43 (Selective Service Regulations) which places a regular minister of religion in Class IV–D. Most important, the registrant bears the burden of clearly establishing a right to the ministerial exemption and the board has no affirmative duty to ascertain whether or not the registrant qualifies for the exemption. Wood v. United States, 5 Cir., 1967, 373 F.2d 894, reversed on other grounds, 389 U.S. 20, 88 S.Ct. 3, 19 L.Ed.2d 20 (1967).

In Dickinson v. United States, 346 U. S. 389, 394, 395, 74 S.Ct. 152, 156, 157, 98 L.Ed. 132 (1953), a ministerial exemption case, the Supreme Court said:

"The ministerial exemption, as was pointed out in the Senate Report accompanying the 1948 Act, 'is a narrow one, intended for the leaders of the various religious faiths and not for the members generally.' S.Rep. No. 1268, 80th Cong., 2d Sess. 13. Certainly all members of a religious organization or sect are not entitled to the exemption by reason of their membership, even though in their belief each is a minister. Cf. Cox v. United States, 1947, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59. On the other hand,

---

have allowed review only by habeas corpus after induction and defense to a criminal prosecution for failure to report for induction." (citing Witmer v. United States, 348 U.S. 375, 377, 75 S.Ct. 392, 99 L.Ed. 428 (1955) in support of the text) Comment, The Selective Service, 76 Yale L.J. 160, 172 (1966).

12. For a further discussion of the narrow scope of review in draft cases, see Comment, Fairness and Due Process Under the Selective Service System, 114 Penna. L.Rev. 1015, 1019 (1966).

a legitimate minister cannot be, for the purposes of the Act, unfrocked simply because all the members of his sect base an exemption claim on the dogma of its faith. That would leave a congregation without a cleric. Each registrant must satisfy the Act's rigid criteria for the exemption. Preaching and teaching the principles of one's sect, if performed part-time or half-time, occasionally or irregularly, are insufficient to bring a registrant under § 6(g). These activities must be regularly performed. They must, as the statute reads, comprise the registrant's 'vocation.' And since the ministerial exemption is a matter of legislative grace, the selective service registrant bears the burden of clearly establishing a right to the exemption."

█ The test, therefore, is whether a registrant, as a vocation, regularly, not occasionally, teaches and preaches the principles of his religion. There must be regularity of religious activities, a ministerial vocation rather than an avocation, and a recognized standing as a minister to a congregation or leader of a group of lesser members of his faith. Wiggins v. United States, 5 Cir., 1958, 261 F.2d 113; Fitts v. United States, 5 Cir., 1964, 334 F.2d 416; Wood v. United States, 5 Cir., 1967, 373 F.2d 894, reversed on other grounds, 389 U.S. 20, 88 S.Ct. 3, 19 L.Ed.2d 20 (1967); Greer v. United States, 5 Cir., 1967, 378 F.2d 931; Foster v. United States, 5 Cir., 1967, 384 F.2d 372; Jones v. United States, 5 Cir., 1968, 387 F.2d 909; Matyastik v. United States, 5 Cir., 1968, 392 F.2d 657.

█ Appellant was certified as a minister by the National Secretary of the Lost Found Nation of Islam and by its leader, Elijah Muhammad. He contends that he spends 90% of his time on his ministerial duties. He submitted 43 affidavits and documents said to contain the signatures of 3,612 people testifying to his ministerial activities. Finally he states that there was no evidence in his file upon which a "basis in fact" could be found to support his 1-A classification

by the board. We are unable to agree with his statements or contentions. The file indicates that appellant joined his religious sect in January 1964. He has apparently earned his living as a professional boxer for a number of years and became professional heavyweight boxing champion of the world on February 25, 1964. Some years earlier he had won the world light heavyweight boxing championship at the Olympics at Rome. He contends that he became a minister of the Muslims in early 1964. In the first information which he supplied to his local board on selective service forms, his occupation was shown to be that of "professional boxer" and "professional prize-fighter." The Report of Medical History dated January 24, 1964 showed his usual occupation to be "boxing." During all this time he made numerous trips to foreign countries to engage in professional bouts which he stated required daily physical training and exercise in preparation for these prizefights. His Current Information Questionnaire dated February 2, 1966 listed his occupation as a "professional boxer" and his work as "professional fighting." Then, on February 17, 1966, the eventful and important date in this case, his 1-Y classification was changed by the local board to 1-A. Clay (Ali) had never stated to his board or claimed to be a minister or a conscientious objector prior to that time. He wrote Local Board No. 47 on February 14, 1966, just three days prior to his reclassification that "My occupation is professional boxer, and I am at present the Heavyweight Champion of the World." Even when he filled out the Special Form for Conscientious Objector dated February 28, 1966, though claiming to be a member of the Nation of Islam, he did not claim to be a minister. His letter of March 17, 1966 to Local Board No. 47 protested that his reclassification imposed "grave hardship upon me as heavyweight champion of the world at now age 24." When he appeared in person before Local Board No. 47 on March 19, 1966, boxing was listed as his livelihood. The evidence which the local board had before it was much more than neces-

sary to constitute a "basis in fact" for his 1–A classification and denial of the ministerial exemption. His vocation is clearly that of a professional boxer.

## IV.

## DENIAL OF CONSCIENTIOUS OBJECTOR STATUS

Appellant's claim that he is a conscientious objector began on February 18, 1966, one day after his reclassification to 1–A, at which time he was furnished the Special Form for Conscientious Objector. He was granted a personal appearance before Local Board No. 47 on March 19, 1966, pursuant to his request. The board's record of that appearance reflects that he claimed hardship on account of taking care of his parents and paying alimony to his former wife. The board's record states, "His religion teaches them not to take part in any way with infidels or any nonreligious group. They fight only in self-defense, not war. Boxing is considered his livelihood." Also, "Clay objects to being in service because he has no quarrel with the Viet Cong. Clay stated that he could not, without being a hypocrit, [sic] take part in anything such as war or anything that is against the Moslim religion." He wrote a lengthy letter to his local board dated April 16, 1966, in which he repeated his hardship request as the sole support of his mother and on account of having to pay alimony to his first wife. He protested that two years of military

service would cause him serious financial loss in being unable to pursue his livelihood as a professional boxer.[13] The local board nevertheless reaffirmed the 1–A classification and the registrant appealed to the appeal board. On May 6, 1966, the complete file was reviewed by the Kentucky Board of Appeals which tentatively determined that the registrant should not be classified in Class 1–O (conscientious objector) or in a lower class. See 32 C.F.R. § 1626.25(a), (b).

The Department of Justice then requested a Federal Bureau of Investigation investigation and a special hearing on the character and good faith of the conscientious objections of the registrant. (32 C.F.R. § 1626.25(d).)[14] The special hearing was held on August 23, 1966, at Louisville, Kentucky, before former Circuit Judge Lawrence Grauman as hearing officer. The hearing officer reported to the Department of Justice that the registrant stated his views in a convincing manner, answered all questions forthrightly, that he was impressed by the statements, believed the registrant was of good character, morals and integrity and sincere in his objection on religious grounds to participation in war in any form. He recommended that his conscientious objector claim be sustained. However, the Department of Justice in a detailed and comprehensive letter opposed his claim[15] and recommended to the Kentucky Board of Appeals that it not be sustained. The Department of Justice concluded that regis-

---

13. The pertinent part of the letter to the board reads as follows:

"Two years is a very long time in the life of a heavyweight champ—from age 22 when I was classified from 1-A to 1-Y, and my present age 24. From age 24—to age 26 I may never be able to overcome this time of loss of boxing sharpness and come back from the service and earn the kind of money required to pay off these financial obligations, even though they may be abated during the time of military service. I would therefore be in hock for the rest of my life, whereas if I can get in a few more fights, which are lined up through the fall of this year, I should be able to

settle these permanent financial obligations from the money I should get within this year, while I am at my peak of shape and am the Heavyweight Champion of the World. A 6-month defense is necessary to retain the title."

14. The regulations follow generally the provisions of the Act on the procedure for considering conscientious objections. See 50 U.S.C. App. § 456(j).

15. The Department's written objections are to be found in the file in a 17-page letter dated November 25, 1966 to the Chairman of the Appeal Board, Western District of Kentucky.

trant's objections to participation in war insofar as they are based upon the teachings of the Nation of Islam "rest on grounds which are primarily political and racial. These constitute objections to only certain types of war in certain circumstances, rather than a general scruple against participation in war in any form." [16] The Department of Justice pointed out that only a general scruple against participation in war in any form can support a claim for conscientious objector status, citing United States v. Kauten, 2 Cir., 1943, 133 F.2d 703.[17] The Department of Justice said that the registrant had not consistently manifested his conscientious objector claim and had not shown overt manifestations sufficient to establish his subjective belief where his claim was not asserted until military service became imminent, not having been made at all prior to being reclassified 1–A in February 1966, and cited in support thereof Campbell v. United States, 4 Cir., 1955, 221 F.2d 454, and United States v. Corliss, 2 Cir., 1960, 280 F.2d 808, cert. denied, 364 U.S. 884, 81 S.Ct. 167, 5 L.Ed.2d 105 (1960). Numerous statements by the registrant made from time to time were quoted by the Department of Justice in justification of its recommendation against the registrant's conscientious objector claim.[18]

16. For a penetrating analysis of the beliefs of the Black Muslims, see Sostre v. McGinnis, 2 Cir., 1964, 334 F.2d 906, cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964). The Court said in that case (at 909):

"Basic to the problem of prison discipline is the fact that the teachings of Elijah Muhammad include condemnation of the entire white race as wholly 'evil,' composed of devils, murderers, thieves, robbers, scientists at tricks, world snoopers, meddlers and liars.4 Presenting almost

"4. Elijah Muhammad has said:

" 'The white race or Caucasian European race is known to God and his prophets as Satan, the devil, the enemy of God and his people (the original nation) power was given to them to rule with evil and falsehood the darker nations for six thousand years. They have done and are now forty-six years overtime and they know this. It will take a few years to complete the separation. Nevertheless the work is going on now at a very good rate of speed.'

" 'The truth of the white race will make all black mankind hate them. The truth of the white race and kind will make all black mankind hate them regardless of their color; black, brown, yellow, or red. The truth of the white race is a part of that secret which was withheld by Allah to allow them, the devils, to live their time, six thousand years.'

" 'If you understood it right you will agree with me that the whole Caucasian Race is a race of devils.'

"(The quotations are from the Supreme Wisdom containing 'the teachings' of the Honorable Elijah Muhammad. This work was an exhibit in the present case.)

"Malcolm X, at the time a 'minister' of the Muslims, said of an airplane accident in which more than 120 white people were killed:

" 'Well, somebody came and told me that he really had answered our prayers over in France. He dropped an airplane out of the sky with over one hundred twenty white people on it, because the Muslims believe in an eye for an eye and a tooth for a tooth, but thanks to God or Jehovah or Allah we will continue to pray and we hope that every day another plane falls out of the sky.'

equal difficulty is the Muslims' demand for total segregation between whites and blacks. These Muslims also adopt the position that the Christian religion is loathsome and despicable.5

"5. 'Bratcher said in the presence of white officers and white inmates, to another colored inmate, "This goddam Jesus Christ has got to go. He has served the purpose of the white man long enough." ' (Testimony of A. J. Meyer.)"

17. The Department of Justice's letter said in part: "It seems clear that the teachings of the Nation of Islam preclude fighting for the United States not because of objections to participation in war in any form but rather because of political and racial objections to policies of the United States as interpreted by Elijah Muhammad." (Letter p. 10.)

18. The special hearing officer quoted the following passage from the registrant's letter to the local board dated February 14, 1966:

" '3. That I am a devoit Muslim and a follower of Islamic religious faith under the discipline of the prophet Elijah Muhammad. To bear arms or kill is against my religion and I conscientiously object to any combat military service that involves the participation in

The registrant was furnished with a copy of the adverse recommendation of the Department of Justice. The Kentucky Appeal Board thereafter reaffirmed the 1–A classification.

Whether the registrant's beliefs are "truly held" is the threshold question of sincerity which must be resolved by the board. United States v. Seeger, 380 U.S. 163, 185, 85 S.Ct. 850,

any war in which the lives of human beings is taken. This I do not believe to be rightous. This has been my faith upward of five years.' [sic]"

The Department of Justice's letter recommendation said:

"It should be noted that while the resume statement of the attorney for the sponsoring group did, as noted by the Hearing Officer, express the opinion that registrant sincerely believes that he is conscientiously opposed to military service, the resume also reflects that the attorney believed that registrant would be sincere in his claim as a conscientious objector 'to the extent that registrant can be sincere in a belief'. The resume further reflects that the attorney 'could not be sure how deep any human conviction goes with the registrant' and that he is 'not certain as to what motivates the registrant in this respect.' (Resume, page 5) The attorney added that in view of his past experiences with the registrant changing his mind, he would not be surprised 'if a year from now the registrant becomes disenchanted with the Muslims and voluntarily joins the United States Marines.' The member of the sponsoring group, it should also be noted, stated that 'I'll go to my grave believing registrant basically is a good boy and was brainwashed first by his father and then by the Muslims.' (Resume, page 7)."

At the special hearing, in response to a question of the hearing officer, the registrant stated, "If the Honorable Elijah Muhammad looked me in my face and he who I believe is directly from Allah, Almighty God Allah, and if he looked at me and advised me, which I'm sure he wouldn't, to fight in any kind of war, if he advised me to I would." Then the registrant testified:

"Sir, I said earlier and I'd like to again, to make that plain, that it would be no trouble for me to accept conscientious objector on the basis that I'll go into the Armed Services boxing exhibitions in Viet Nam, or traveling the country at the expense of the Government or living in the easy life and not having to get out in the mud and fight and shoot and if this — — if I could do this, or if it was something I wanted to do, or was in my heart to do if it wasn't

against my conscience to do it, I would easily do it. I wouldn't raise all this court stuff and I wouldn't go through all of this and lose and give up the millions that I gave up and my image with the American public that I would say is completely dead and ruined because of us in here now, and so I wouldn't turn down so many millions and jeopardize my life walking the streets of the South and all of America with no bodyguard if I wasn't sincere in every bit of what the Holy Qur'an and the teachings of the Honorable Elijah Muhammad tell us and it is that we are not to participate in wars on the side of nobody who—on the side of non-believers, and this is a Christian country and this is not a Muslim country, and the Government and the history and the facts shows that every move toward the Honorable Elijah Muhammad is made to distort and is made to condemn him and is made to condemn him and the Government has admitted that the police of Los Angeles were wrong about attacking and killing our brothers and sisters and they were wrong in Newark, New Jersey, and they were wrong in Louisiana, and the outright, everyday oppressors and enemies are the people as a whole, the whites of this nation. So, we are not, according to the Holy Qur'an, to even as much as aid in passing a cup of water to the—even a wounded. I mean, this is in the Holy Qur'an, and as I said earlier, this is not me talking to get the draft board—or to dodge nothing. This is there before I was borned and it will be there when I'm dead and we believe in not only that part of it, but all of it."

The registrant affirmed at the hearing that he was correctly quoted by the Chicago Daily News on February 18, 1966, the day after his reclassification to 1-A, as follows:

"I am a member of the Muslims and we don't go to no war unless they are declared by Ali himself. I don't have no personal quarrel with those Vietcongs.

 * * * * *

"Let me tell you, we Muslims are taught to defend ourselves when we are attacked. Those Vietcong are not attacking me. These Vietcong are fight-

863, 13 L.Ed.2d 733 (1965).[19] The "basis in fact" test applied to the conscientious objector claim of registrant was fully met in this case. There was more than adequate evidence to justify the rejection of his claim.

## V.

### THE BILL OF ATTAINDER

The Constitution prohibits the passing of a bill of attainder by Congress, Art. I, § 9, Cl. 3, and a bill of attainder is said to be a legislative act which inflicts punishment without a judicial trial. Cummings v. State of Missouri, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867). As interpreted by the Supreme Court, this clause prohibits all legislative acts "no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial * * *." United States v. Lovett, 328 U.S. 303, 315, 66 S.Ct. 1073, 1078, 90 L.Ed. 1252 (1946). Accordingly, appellant contends that the whole proceeding of his classification and induction into the military service constituted a prohibited bill of attainder. The only issue submitted to the jury at his trial was whether he refused to take the step forward at the induction ceremony. Appellant contends in brief that "Every important factual adjudication was extra judicially made by administrative bodies operating under the Act." Since the draft board's authority flows from congressional enactment, appellant argues that Congress has subjected him to a non-judicially imposed penalty in a non-judicial forum. He maintains that he was classified without a judicial trial.

So far as the trial proceedings before the District Court are concerned, there was no irregularity or failure to provide due process of law. The District Judge informed the jury that he had examined the defendant's Selective Service File and found, as a matter of law, that there was a basis in fact for the 1–A classification given the registrant. The jury was instructed that it was not to consider the question of whether or not the defendant was entitled to this classification for this determination was not for the jury. This ruling and instruction was in exact conformity with the Supreme Court's teaching in Cox v. United States, 332 U.S. 442, 452, 453, 68 S.Ct. 115, 120, 92 L.Ed. 59 (1947), where the Court said:

> "Whether there was 'no basis in fact' for the classification is not a question to be determined by the jury on an independent consideration of the evidence. The concept of a jury passing independently on an issue previously determined by an administrative body or reviewing the action of an administrative body is contrary to settled federal administrative practice; the constitutional right to jury trial does not include the right to have a jury pass on the validity of an administrative order."

Proceedings before local and appeal boards are informal and are stripped of the panoply of formal judicial tribunals. United States v. Pitt, 3 Cir., 1944, 144 F.2d 169, 172. Such proceedings are non-judicial in nature and are clearly non-criminal, for appellant was neither a suspect nor an accused and he was appearing before the boards which were giving him a hearing only in an administrative proceeding. United

ing a very nasty war over there. There is a lot of people getting killed. Why should we Muslims get involved? Besides, I am fighting for the government every day. I am laying my life on the line for the government. Nine out of ten soldiers would not want to be in my place in the ring. It is too dangerous."

19. The Third Circuit recently rejected the claim of a Roman Catholic for conscientious objector classification who said he would fight only in a "just war" and that denial of such classification would violate his federally protected right to religious freedom and equal protection of the law. United States v. Spiro, 3 Cir., 1967, 384 F.2d 159, cert. denied, 390 U.S. 956, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968).

States v. Sturgis, 3 Cir., 1965, 342 F.2d 328, 332. It is true that appellant sought a judicial determination of his case prior to induction, and the decision was adverse in every tribunal to which he presented this issue. The Sixth Circuit, in declining to grant him an injunction pending his appeal from the decision of the Kentucky Federal District Court, said:

> "We do not believe that Congress ever intended that draftees should have the right to litigate the validity of their induction before acceptance for National Service. If injunction suits were permitted, interminable delays would undoubtedly result while the cases were being processed in the Courts. Such a procedure would interfere with the orderly proceedings of the draft boards and prevent them from filling their quotas and supplying the armed forces with much needed personnel." Muhammad Ali v. Breathitt, 6 Cir., April 17, 1967, Docket No. 17834, unpublished.

Similar relief was also denied by the Fifth Circuit by its numerous orders to which we have previously referred.

▆▆▆ The most recent amendment to the draft law (now called the Military Selective Service Act of 1967) permits judicial review only "as a defense to a criminal prosecution instituted * * * after the registrant has responded either affirmatively or negatively to an order to report for induction." [20] The amendment was undoubtedly Congress' answer to the holding in Wolff v. Selective Service Local Board No. 16, 2 Cir., 1967, 372 F.2d 817, in which the Second Circuit upheld preinduction judicial review [21] of a selective service classification which allegedly infringed upon the constitutional right to free speech. That case involved the reclassification of deferred students, making them available for military duty because of participation in Viet Nam. Preinduction consideration was afforded petitioners on the narrow constitutional ground that the reclassification would have a continued chilling effect, Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), on them by being subjected to the added sanction of induction. It is clear by the 1967 amendment to the Act that Congress intends there be no preinduction judicial proceedings which would interfere with the orderly drafting of needed manpower for the armed forces. DuVernay v. United States, 5 Cir., 1968, 394 F.2d 979 [No. 24132, February 7, 1968]. Judicial review prior to induction, even on constitutional grounds, is an open invitation to a large volume of litigation, much of which we could expect would undoubtedly be based on frivolous grounds in an attempt to delay or evade military service. As the Supreme Court said in Falbo v. United States, 320 U.S. 549, 554, 64 S.Ct. 346, 349, 88 L.Ed. 305 (1944):

> "The circumstances under which the Act was adopted lend no support to

20. 50 U.S.C. App. § 460(b) (3), as amended in 1967, reads as follows:

"No judicial review shall be made of the classification or processing of any registrant by local boards, appeal boards, or the President, except as a defense to a criminal prosecution instituted under section 12 of this title, after the registrant has responded either affirmatively or negatively to an order to report for induction, or for civilian work in the case of a registrant determined to be opposed to participation in war in any form: Provided, That such review shall go to the question of the jurisdiction herein reserved to local boards, appeal boards, and the President only when there is no basis in fact

for the classification assigned to such registrant."

21. "While there was no serious question that eventually petitioners would be able to secure review, Wolff is the first case allowing direct judicial review of a registrant's classification prior to induction. It had been held almost without exception that aggrieved registrants could not challenge the determinations of their local boards in the courts except by either submitting to induction and seeking habeas corpus relief, or by refusing induction and securing review by way of a defense to a criminal prosecution." Comment, 81 Harv.L.Rev. 685, 686 (1968).

The Government did not file a petition for certiorari in the Wolff case.

a view which would allow litigious interruption of the process of selection which Congress created. To meet the need which it felt for mobilizing national manpower in the shortest practicable period, Congress established a machinery which it deemed efficient for inducting great numbers of men into the armed forces. Careful provision was made for fair administration of the Act's policies within the framework of the selective service process. But Congress apparently regarded 'a prompt and unhesitating obedience to orders' issued in that process 'indispensable to the complete attainment of the object' of national defense. Martin v. Mott, 12 Wheat. 19, 30, 25 U.S. 19, 30, 6 L.Ed. 537. Surely if Congress had intended to authorize interference with that process by intermediate challenges of orders to report, it would have said so."

■ The registrant's remedy is in defense to a criminal prosecution if he declines induction, and habeas corpus if he accepts induction but is still aggrieved by the classification process. Witmer v. United States, 348 U.S. 375, 377, 75 S.Ct. 392, 394, 99 L.Ed. 428 (1955).[22]

■ In the present matter the registrant fully exhausted all administrative remedies available to him. In that respect the case differs from DuVernay v. United States, 5 Cir., 1968, 394 F.2d 979 [No. 24132, February 7, 1968], where we affirmed the conviction of DuVernay because of his failure to exhaust administrative remedies. We also pointed out in footnote 6 of that

case (394 F.2d 983) that as to the attack on the racial composition of the local board, since draft board members are public officers appointed by the President, a challenge to the composition of the board indirectly challenges the qualifications of the present members and their eligibility to perform their duties. We said that the public officers' authority was not subject to collateral attack in the criminal proceeding but must be challenged by direct attack. DuVernay's conviction, however, was not affirmed on that issue but on the failure of the draftee to exhaust administrative remedies. While it is true that qualifications of a public officer generally may not be collaterally attacked, the charge of systematic exclusion of Negroes from draft boards in this case, where all administrative remedies have been exhausted, is of constitutional proportions and warrants our consideration and disposition of that issue. We do not view appellant's contention here as requiring the removal of draft board members because of so-called systematic exclusion or racial imbalance, but that appellant seeks to have their acts declared invalid as to him. It is apparent that the systematic exclusion contention must, therefore, be decided. Accordingly, we have given full consideration to that contention, now urged in this criminal proceeding, though we believe it is not applicable insofar as draft board membership is concerned, and, at the least, that the acts of such boards are de facto valid and binding. United States ex rel. Watkins v. Commonwealth of Pennsylvania, D.C., W.D. Penna., 1963, 214 F.Supp. 913; United

22. In Schwartz v. Strauss, 1953, 206 F.2d 767, the Second Circuit affirmed on the opinion below (114 F.Supp. 438) the District Court's denial of relief to a plaintiff who sought a preinduction declaratory judgment and an injunction "claiming that his selective service classification is erroneous as a matter of law and that he is thereby deprived of certain constitutional rights." The District Court said "that there are many authorities that do

not permit judicial review before induction" and that "the Congressional intent was to keep the administrative process of the Selective Service System free from the delays and disruption incident to court interference prior to induction." The Court said that "plaintiff's remedy is by way of habeas corpus after induction or by refusing to be inducted after the administrative process is complete." 114 F.Supp. at 439.

States ex rel. Doss v. Lindsley, 7 Cir., 1945, 148 F.2d 22, cert. denied, 325 U.S. 858, 65 S.Ct. 1195, 89 L.Ed. 1978 (1945). There is no question involved here of the board acting beyond its jurisdiction in classifying and attempting to induct appellant who, under the Act and regulations, is clearly a proper subject for military service in the armed forces of the United States. Since under the Act and the settled law the systematic exclusion contention may not properly be raised prior to induction, we have concluded that it is reasonable, all administrative and other remedies having been exhausted by appellant, that we meet the issue squarely and resolve it, which we have done.[23]

There is no merit to the bill of attainder argument as we have seen.

The conviction and sentence are, therefore, affirmed.

ON PETITION FOR REHEARING
EN BANC

PER CURIAM.

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25(a), subpar. (b), the Petition for Rehearing En Banc is denied.

**23.** Appellant raised another issue which is without merit. He claimed deprivation of due process because of the inclusion in his Selective Service File of numerous letters and newspapers clippings alleged to be prejudicial, and also because of prefinal classification statements of General Hershey, the National Director, and Congressman Rivers, Chairman of the House Armed Services Committee. We have heretofore described the statements of General Hershey and Congressman Rivers in Chapter II of this opinion. The record shows quite clearly that it is the practice of local boards to place all correspondence relating to a registrant in his file. A number of letters and clippings from members of the general public protesting the delay in inducting appellant were received by the board and filed. The record is devoid of any indication that these letters and clippings played any part whatsoever in the ultimate classification of appellant. That is also true of the statements of the General and Congressman. As to General Hershey's statement, we have already shown that board is independent of the National Director as provided in 32 C. F.R. § 1604.6(a), (b), (c), and it was General Hershey who caused an appeal of registrant's case to the Presidential Appeal Board. Obviously it is the right of Congressmen to express opinions on matters of public interest, including registrant's draft case. But nothing in the record of this case shows that Congressman Rivers' statement had any effect on the classification of appellant.