**UNITED STATES of America, Plaintiff,**

v.

**Cassius Marsellus CLAY, Jr., a/k/a Muhammad Ali, Defendant.**

**Cr. No. 67-H-94.**

United States District Court, S. D. Texas, Houston Division.

July 14, 1969.

Anthony J. P. Farris, U. S. Atty., Houston, Tex., John S. Martin, Jr. and Michael T. Epstein, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

Charles Morgan, Jr., Atlanta, Ga., Chauncey Eskridge, Chicago, Ill., and M. W. Plummer, Houston, Tex., for defendant.

*Memorandum*

INGRAHAM, District Judge.

The defendant, Cassius Marsellus Clay, Jr., was convicted by a jury in this court on June 20, 1967, for unlawfully failing to submit to induction into the armed forces of the United States. The conviction was affirmed. Clay v. United States, 397 F.2d 901 (5 CA 1968). The Supreme Court granted certiorari and the case is again before this court on remand from the Supreme Court, Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969), for further proceedings in conformity with Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). It was revealed while the defendant's petition for certiorari was pending that the defendant had been a party to five telephonic conversations which had been electronically overheard by agents of the Federal Bureau of Investigation. Remand was held necessary, as it was in Alderman, for the district court to determine whether the defendant's conviction was tainted by the information obtained as a result of the electronic surveillance. The Court in Alderman set out the procedure the district court was to follow in making that determination.

Conforming therewith, this court conducted hearings on June 4, 5 and 6, 1969, and, at the court's request, briefs were filed by counsel. After thoroughly considering the evidence adduced at the hearing, the transcript of those proceedings, and the attorneys' briefs, the court enters this memorandum decision, the following to constitute findings of fact and conclusions of law as ordered in Alderman.

## I.

The prosecution delivered to the court, in advance of the hearing, logs of five telephone conversations in which the defendant was one of the conversing parties. It was asserted by the government, and the court credits the assertion as true, that these logs were the only ones found in the F.B.I. files in which the defendant's conversations were overheard. In no instance was the defendant's telephone monitored; it was the other party to the conversation whose telephone was placed under surveillance. It is clear, however, and it is unchallenged by the government, that the defendant has standing to challenge the legality of the surveillance, and to seek suppression of any illegally obtained evidence.

Upon receipt of the logs of the five conversations, the court, at the request of the government, placed four of them (hereinafter referred to as logs 1, 2, 3 and 4) under a protective order. The order provided that the logs would be available to the defendant and his attorneys for inspection, but that they would be prohibited from disclosing the contents to anyone without permission from the court. However, it became apparent that it would be impossible to conduct a public hearing and explore the relevance of the logs in light of the protective order. The order was therefore dissolved, and the logs were admitted into evidence. The fifth log, which will be discussed later, was not disclosed to the defendant and was not received into evidence, although it was read and considered and will be subject to review upon appeal herefrom.

As was outlined in Giordano v. United States, supra, the court must decide first, whether the defendant "has standing to assert the illegality of the surveillance or of the introduction of its fruits," and second, whether the surveillance was unlawful, for if it was lawful, disclosure and further proceedings would be rendered unnecessary. The first issue has been answered in the affirmative, and the second, the illegality of the surveillance, was never challenged by the government. Since the surveillance was acknowledged to be illegal, the ultimate issue to be decided by the court is "whether the evidence against the (defendant) . . . grew out of his illegally overheard conversation . . . The question as stated in Wong Sun v. United States, 371 U.S. 471, 488, [83 S. Ct. 407, 9 L.Ed.2d 441] (1963), is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " Alderman v. United States, supra at 180–181, 89 S.Ct. at 970.

The logs of the four conversations admitted into evidence are as follows:

### Log 1 (GX–102)

It was shown that this conversation, which took place on April 22, 1965, was overheard via a wiretap placed on the telephone of Elijah Muhammad in Phoenix, Arizona.

"Herbert called, via operator, to 305–635–8893 in Miami and asked to speak to Cassius Clay. Herbert told Clay he was here in Arizona and asked how Clay was. Clay said he was fine and was down to 213 pounds. Herbert told him not to over do it. Herbert asked him if he was going to Boston soon and he said yes, about a week and a half. Herbert said he would be down there to see him fight with his brother. Clay told him to call two days before. Clay mentioned that one boy had backed out. He asked Herbert how long he was going to be out here and Herbert said he might leave tomorrow. Herbert asked how everything else was and Clay said fine. Herbert asked how his brothers were and Clay mentioned that James got put out of the temple for being out all night with women. Herbert said Clay knew what to do with a case like that, to get him a ticket and send him back where he came from. Herbert asked about . . . . (probably his wife) and Clay said she had gone to Jackson with a lady friend. Herbert said he would probably call him to-

morrow, to take it easy and if there was anything he could do to let him know. Clay mentioned something about having Herbert check his car when he, Herbert, got to Chicago. /Recorded,/."

Another summary of the same conversation, marked GX–106, was also admitted. It differs from Log 1 only in minor detail and need not be quoted here.

*Log 2 (GX–103)*

Taken on March 24, 1964, this was also a result of the Elijah Muhammad wiretap.

"Elijah took call from C. Clay. Elijah asked the time there and then said it was only 1 hr. faster than here. Elijah said he wanted to see Clay as he was going to make a minister out of him when he quite (sic) thinking of fighting all the time. Elijah said he would make a better minister than a fighter anyhow. Elijah then said he would contact him when he had time to talk to him. Elijah also told him to keep quiet."

Another summary of this conversation, marked GX–107 and received in evidence, is almost identical to the foregoing, and need not be quoted here.

*Log 3 (GX–104)*

Another log from the Phoenix wiretap on the telephone of Elijah Muhammad, taken on October 22, 1964.

"Man believed to be John Ali is heard dialing out on Albert's phone for a long distance call via direct dial. He then talks to person believed to be Muhammad Ali (Clay) and says he has just talked with the Messenger and the Messenger would like for him to hold up those TV people a while since they are going to be here Saturday and he will see what they want so that he (Elijah) will know what (Clay) is going to be asked to say. John mentions that he will probably be coming there when he leaves Phoenix and should be there for Saturday and Sunday. He then gives the Muslim closing."

*Log 4 (GX–105)*

This log was taken on September 4, 1964, in Atlanta, Georgia. The telephone under surveillance belonged to Dr. Martin Luther King, Jr.

"Chauncey to MLK, said he is in Miami with Cassius, MMLK spoke to Cassius, they exchanged greetings, MLK wished him well on his recent marriage, C invited MLK to be his guest at his next championship fight, MLK said he would like to attend. C said that he is keeping up with MLK that MLK is his brother, and with him 100% but can't take any chances, and that MLK should take care of himself, that MLK is known world wide and should watch out for them whities, said that people in Nigeria Egypt and Ghani asked about MLK."

Because the defendant suggested that this log did not contain all of the conversation with Dr. King that he was entitled to receive, the government submitted to the court for an in camera examination the original log from which Log 4 was prepared. The court has read it, and concludes that the defendant's assertion is without merit. If there was any further conversation between Dr. King and the defendant, it was not recorded in the log; the defendant is not entitled to see a log of a conversation to which he was not a party.

Turning to the significance of the logs, the only manner in which the foregoing conversations were argued relevant to the defendant's conviction centered around the rejection of the defendant's conscientious objector claim. This was a plausible argument, for if the recommendation by the Department of Justice to deny the claim was based upon illegally obtained evidence, the "basis in fact" which this court found for his classification would have been defective. Without such a "basis in fact", the defendant could effectively challenge the jurisdiction of the draft board which classified him and ordered him to report for induction.

The specific relevancy sought between the defendant's classification and the overheard conversations involves the

statement in the Department of Justice's recommendation that "registrant's objections to participation in war insofar as they are based upon the teachings of the Nation of Islam 'rest on grounds which are primarily political and racial. These constitute objections to only certain types of war in certain circumstances, rather than a general scruple against participation in war in any form.'" Clay v. United States, 397 F.2d 901 (5 CA 1968). The defendant attempted to show first, that because Log 2 reflects Elijah's wish that Clay become a minister, and because Log 4 reflects Clay's reference to "them whities", the logs would have a bearing on the Department's conclusion that the defendant's beliefs were political and racial, rather than religious. He secondly attempted to demonstrate how this information was transmitted upward through F.B.I. channels, through the Department of Justice and into the recommendation, and back to the draft appeals board.

■ As to the second argument, that the information was used by the Department of Justice in making its recommendation, there was positive testimony that the logs were not used at all in the preparation of the report. Only the most strained construction of the cross-examination testimony would support a contrary finding. But the court need not reach this question, for it believes, and so holds, that the logs are so totally innocuous they could not have had any bearing on the defendant's conviction under any circumstances. This is because, first, as regards Log 2, the Department of Justice's duty was to submit a recommendation concerning the defendant's status as a conscientious objector, not a minister. It is obvious that the Department could have, had it believed it was warranted, recommended that the defendant be granted a conscientious objector deferment despite the fact that he was not a minister of his religion. Moreover, even if this issue had been before the Department, it is clear that the evidence that he was not a minister up to at least March 19, 1966, is overhelming. See discussion in Clay

v. United States, supra at 915–918. Thus examining this log in a light most likely to demonstrate prejudice to the defendant, there is more than enough evidence to dispel possible taint. The conclusion that the defendant should not have been entitled to a ministerial exemption springs clearly from an "independent origin". Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L. Ed. 307 (1939).

■ Defendant's attempt to link Log 4 to his conviction must similarly fail. To construe a passing reference to "them whities" as being the Department's basis, or even partial reason, for holding the defendant's beliefs to be political and racial is completely untenable. The conversation was not a theological discussion. The common slang reference was not within a context which could have had any bearing on the defendant's beliefs. A Negro not a member of the Nation of Islam would be as likely to say the same thing. In addition, if it had been in such a context, and it could be construed to be even viciously derogatory, again there was ample evidence from an independent origin before the Department to conclude that the Muslim religion holds the white race in contempt. See Clay v. United States, supra 397 F.2d at 919 n. 16.

As regards Logs 1 and 3, they are so totally innocuous even defendant's counsel could not point to any specific language which could bear on the defendant's conviction. The thrust of defendant's argument concerning these logs, as well as Logs 2 and 4, was that there must have been other matters discussed by the parties which were relayed to the Department of Justice. The court does not credit this argument. The testimony was clear that the original tapes were erased immediately after the logs were typed, and that the logs received in evidence were the only ones prepared. The individuals who monitored the conversations in Phoenix testified that they communicated no other information to anyone. The evidence also substantiates, without the need for further discovery, that no other information from

the Atlanta wiretap was communicated to any person in the Department of Justice. As to the notation on the Atlanta wiretap log, AT 1379–S*, the court credits the government's claim that this number was the number assigned to the telephone surveillance, and does not refer to any F.B.I. employee.

■ In Alderman v. United States, supra, the Court said that "(n)one of this means that any [petitioner] will have an unlimited license to rummage in the files of the Department of Justice. Armed with the specified records of overhead conversations and with the right to cross-examine the appropriate officials in regard to the connection between those records and the case made against him, a petitioner may need or be entitled to nothing else. Whether this is the case or not must be left to the informed discretion, good sense, and fairness of the trial judge." Id. 394 U.S. at 185, 89 S.Ct. at 973. And in Taglianetti v. United States, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969), the Court said that "(n)othing in Alderman v. United States, Ivanov v. United States, or Butenko v. United States, [ante,] p. 165, requires an adversary proceeding and full disclosure for resolution of every issue raised by an electronic surveillance. . . . Here the defendant was entitled to see a transcript of his own conversations and nothing else. He had no right to rummage in government files." Id. at 317, 89 S.Ct. at 1100–1102. Despite the foregoing, the defendant's counsel insistently requested what would be, in essence, a full-scale inquiry into F.B.I. practices. The court does not believe that anything was shown which would warrant such an inquiry. Defendant had ample opportunity to demonstrate first, that the logs contained prejudicial material, and second, that the material was communicated to and was used by the Department of Justice in making its recommendation. Had he established the first, perhaps more extensive discovery would have been in order. But the defendant should not be permitted such broad discovery to at-

tempt to prove transmittal of the information if he cannot first show that the information could have been, even in part, relevant to his conviction.

It might be added that Taglianetti v. United States, supra, intimates that the district court could, in some circumstances, make the determination that wiretap evidence is innocuous in an in camera inspection. This is, the court believes, such a case. Nevertheless, an adequate opportunity was given the defendant to prove relevance in an adversary proceeding. The proceeding was as extensive as Alderman requires. He failed to show the requisite relevancy, and the conviction must stand.

## II.

As noted earlier, "a finding by the District Court that the surveillance was lawful would make disclosure and further proceedings unnecessary." Giordano v. United States, supra, 394 U.S. at 313, 89 S.Ct. at 1165. The court held with regard to the fifth wiretapped conversation that the surveillance was lawful. The log of that conversation, along with the authorization for the wiretap, was sealed and returned to the United States Attorney.

■ Whether the Attorney General's authorization of a wiretap for the purpose of gathering foreign intelligence information violates the Fourth Amendment is an issue of extreme gravity. It has never been decided by the Supreme Court, and this court will not speculate on the direction in which the Justices will lean. See concurring opinion of Justice Stewart in Giordano v. United States, supra at 314–315, 89 S.Ct. 1163. The court is aware, of course, of the abuses possible should an Attorney General authorize extensive wiretaps under the guise of collecting foreign intelligence information. But the court also recognizes that such investigations are, in many instances, vital to the maintenance of national security.

The court agrees with the government's counsel that in determining

whether to employ wiretapping, the President or the Attorney General must make a judgment based on foreign policy considerations. It would not be feasible for the executive to attempt to bring to the court's attention all the factual and policy considerations supporting the decision. Moreover, it is the executive, not the judiciary, which alone possesses both the expertise and the factual background to assess the reasonableness of such a surveillance. From a purely practical standpoint, it is ridiculous to place on a United States Commissioner the burden of deciding what is and what is not a threat to national security. The court does not believe the judiciary should question the decision of the executive department that such surveillances are reasonable and necessary to the protection of the national interest.

For the foregoing reasons, the defendant's motions to dismiss or set aside the verdict of the jury, sentence and indictment, and for a new trial, will be denied.

The defendant will present himself before the court for sentencing on Thursday, July 24, 1969, at 9:30 A.M.