**Julita David ROBERTSON, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 25099.**

United States Court of Appeals
Fifth Circuit.

Sept. 25, 1969.

Godbold, Circuit Judge, dissented.

Stephen D. Susman, Houston, Tex., for appellant.

Will Wilson, Asst. Atty. Gen., Criminal Div., Dept. of Justice, Washington, D.C. Robert E. Hauberg, U. S. Atty., E. Donald Strange, Asst. U. S. Atty., Jackson, Miss., for appellee.

Before JOHN R. BROWN, Chief Judge, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLD-BERG, AINSWORTH, GODBOLD, DYER, SIMPSON and MORGAN, Circuit Judges, En Banc.

AINSWORTH, Circuit Judge:

Appellant Julita David Robertson, a Jehovah's Witness, having waived jury trial, was tried and convicted by the District Judge for failure to report as a conscientious objector for civilian employment in lieu of military service, in violation of 50 U.S.C. App. § 462. He appealed on the principal ground that the local Selective Service board improperly declined to grant him a ministerial ex-

emption and therefore that his conviction was erroneous. A panel of this Court, by a 2-to-1 vote, reversed the conviction. Robertson v. United States, 5 Cir., 1968, 404 F.2d 1141. On motion of one of the regular active judges of this Court (see Federal Rules of Appellate Procedure, Rule 35), en banc rehearing was ordered. We conclude on rehearing that the judgment of conviction below should be affirmed, and accordingly reverse the decision of the panel of this Court.

Robertson, then 18 years of age, registered with his local board at Gulfport, Mississippi, on February 11, 1963 and was classified thereafter as II–S (student). He withdrew from school on January 14, 1965, and was classified I–O (conscientious objector) on March 12, 1965, and I–O Acceptable on August 13, 1965. No appeals were taken by him from these classifications nor did he seek a personal interview with the local board about them. After he left school he had no employment except various odd jobs such as grass cutting and occasionally photography. He lived at home with his parents who supported him and gave him an allowance of $10 per month.

On August 13, 1965, he was mailed a Special Report for Class I–O Registrants and informed that under Selective Service Regulations he was required to submit to the local board three types of approved civilian work "which you are qualified to perform and which you offer to perform in lieu of induction into the Armed Forces." His response on August 17, 1965, was that he had chosen the ministry as his primary purpose in life and was submitting it as "my first choice and my only preference of civilian work."

On August 27, 1965, he was given a conference with Colonel Shed H. Weeks, Chief, Administrative Division, Mississippi State Headquarters, Selective Service System, at the local board office in Gulfport, Mississippi, where in company with his father and two other Jehovah's Witness workers he met with Colonel Weeks to discuss his eligibility for a IV–D (minister's) classification. He was

given the reasons why he was not now eligible for such classification and was instructed as to how he could qualify under the Selective Service Regulations. He was informed of the requirements to qualify as a Regular Pioneer preacher, Congregational Servant and Assistant Congregational Servant of his religious sect, and was told that he must be putting in enough time in his preaching activities to consider this as his vocation and must be preaching regularly. At that time he told Colonel Weeks that he was not attempting to get a IV–D (ministerial) classification and further said that he was not qualified either under Selective Service Regulations or requirements of the Watchtower Bible and Tract Society (Jehovah's Witnesses). On the same day his local board sent a letter to him submitting three types of work in the Mississippi State Hospital deemed appropriate for him to perform in lieu of induction into the armed forces. He was informed that he would work as a civilian, in civilian clothes and be paid the prevailing wage scale by the hospital and would be given the rights and privileges offered all other civilian employees of similar employment, that his work would be under the direct supervision of the hospital.

Robertson came to the local board office on September 3, 1965, and submitted two letters signed by fellow Jehovah's Witnesses stating that he averaged 30 to 40 hours each month in the ministry, that he attended Congregation Book Study every Tuesday night, Theocratic Ministry School and Service Meeting Friday night and the study of the Bible on Sunday afternoon, that he assisted his Magazine-Territory Servant, was engaged as a Vacation Pioneer, and had applied for Regular Pioneer appointment. He declined to say whether he would perform any kind of civilian work in lieu of going into the armed forces.

On September 8, 1965, he wrote to his local board declining to accept civilian employment in lieu of induction, stating he had chosen the full-time ministry as "my goal in life." At that time he

submitted two additional statements from fellow Jehovah's Witnesses, one of which indicated he was spending 30 to 35 hours a month in the ministry, that he was attending a Theocratic Ministry School every week, was assistant to the Magazine-Territory Servant and was engaged as a Vacation Pioneer. On September 14, 1965, he submitted to the local board office a retroactive two-week Vacation Pioneer Appointment dated September 2, 1965, appointing him to serve as a Vacation Pioneer Minister from August 18 to August 31, 1965. Robertson's Selective Service File discloses that on September 15, 1965, the local board met and "registrant's file was studied by them carefully." The board digested the Watchtower Society letter of September 2, 1965, and the two-week retroactive Vacation Pioneer Appointment of registrant, reviewed "other statements and reports in his file, and from their interpretation of Local Board Advice No. 97 and other Memorandums and Selective Service Regulations, they were under the impression that this registrant had only recently applied for appointment as a vacation pioneer and had not * * * made application for appointment as a regular pioneer, nor would he qualify if he had." The board strongly suspected registrant "was stalling for time." No action was taken at that time by the board.

A regular meeting of the local board was held on October 14, 1965, at which time Robertson was present with members of the board and Colonel Weeks of Selective Service Headquarters. At that time an effort was made to reach an agreement with the registrant as to the type of work he should be ordered to perform in lieu of induction. The minutes of the board show in part:[1] "Before dis-

---

1. The full text of the minutes is as follows:

"SUMMARY OF LOCAL BOARD MEETING WITH REGISTRANT IN ACCORDANCE WITH SECTION 1660.20 (C) OF THE REGULATIONS

"Subject: ROBERTSON, Julita David SS No 22 26 45 35

"In accordance with Section 1660.20 (c) of Selective Service Regulations, the local board met with the subject registrant and the representative of the State Director in an effort to reach an agreement as to the type of work that the registrant should be ordered to perform in lieu of induction into the armed forces.

"Local board members present were Dr. John B. Anderson, Chairman; Mr. Alex W. Roy, Jr.; Mr. Joe M. Petro; and Mr. Claude B. Lundy, Jr. Local board clerks present were Mrs. Virginia R. Hall, Clerk; and Mrs. Carole Mayatte, Assistant Clerk. Lt. Colonel Shed H. Weeks, Mississippi State Headquarters, represented the State Director of Mississippi at this meeting.

"Before discussing the type of work that the registrant should perform, the local board again reviewed the file concerning the registrant's preaching activities. The local board reviewed photostatic copy of Vacation Pioneer appointment of the registrant and letters of friends and brothers concerning the registrant's ministerial activities. The local board asked the registrant if he felt he was qualified for a IV-D classification under the criteria of Selective Service Regulations. He not only replied in the negative, but stated that he did not qualify for a full-time minister as required by the Watchtower Bible and Tract Society. The registrant further stated that he was not requesting or expecting the local board to grant him a IV-D classification, therefore the type of civilian work for him to perform in lieu of induction was then discussed. Colonel Weeks explained to the registrant the type of work that was available at approved agencies in Mississippi. The local board advised the registrant that rehabilitation work located at Mississippi State Hospital, Whitfield, Mississippi was available for him to perform in lieu of induction, along with other acceptable types of work. The local board then asked the registrant if he had any work that he would be willing to perform if approved by the Selective Service. He stated that he did not. They then offered him rehabilitation work located at Mississippi State Hospital, Whitfield, Mississippi, which he declined to accept. He was then asked if he would accept approved work at any other approved agencies in this state or any other state, which he also declined to accept. He was then informed that his file would be submitted to National Headquarters

cussing the type of work that the registrant should perform, the local board again reviewed the file concerning the registrant's preaching activities. The local board reviewed photostatic copy of Vacation Pioneer appointment of the registrant and letters of friends and brothers concerning the registrant's ministerial activities." The registrant stated, as he had to Colonel Weeks on August 27, 1965, that he did not qualify for a full-time minister as required by the Watchtower Society and that he was not requesting or expecting a IV–D ministerial classification. He declined to accept civilian work at the Mississippi State Hospital or any other type of approved work. He was then informed that his file would be submitted to National Headquarters for their approval to authorize the local board to order him to civilian work at the Mississippi State Hospital. The registrant was orally advised by the board that they would not reopen his classification and classify him anew as he had no new evidence and did not qualify as a minister.

On October 18, 1965, four days later, the board received from registrant a copy of a two-month Vacation Pioneer Appointment dated September 23, 1965, appointing Robertson as a Vacation Pioneer Minister from September 1 to October 31, 1965. Also submitted was a letter from the Watchtower Society to Robertson dated September 20, 1965, stating that Robertson did not "meet all of the established requirements for the regular pioneer service" as to hours, back-calls and Bible studies, and "Since this is the case, we are not able to appoint you to the regular pioneer service at this time." The letter stated that the appointment would be from October 1, 1965, through January 31, 1966, although as issued three days later it was only for

a two-month period, September 1 to October 31, 1965. The postscript to the letter stated, "In view of the fact that *your ministry is quite low,* you will want to strive to build it up by giving attention to all features of the work." (Emphasis added by the Court.)

On November 2, 1965, the local board, having obtained the necessary approval from National Headquarters to do so, mailed to Robertson an Order to Report for Civilian Work at its office on November 15, 1965, to receive instructions for proceeding to the place of employment (the Mississippi State Hospital) in lieu of military service. Robertson, then 20 years old, was called up in regular order by the board according to birth date. He failed to report on November 15, 1965, as ordered. After receiving the order to report of November 2, 1965, he wrote a letter to the local board dated November 8, 1965, requesting that the board reopen his classification and that he be accorded a personal appearance before the board on the basis of his ministerial claim. He attached the Watchtower Society letter of September 20, 1965 (the same letter submitted by him to the board on October 18, 1965), relating to his appointment as a Vacation Pioneer, and further stated that he had spent 100 hours in the full-time ministry during the month of October 1965.

 With the increased number of Selective Service cases which have come before the federal courts in recent years, certain principles of law have evolved which are now well known. The scope of review in draft cases is very limited, and the range of review is the narrowest known to the law. The courts do not sit as super draft boards, substituting their judgments on the weight of the evidence, nor should they look for substantial evi-

---

for their review and approval for the local board to order him to rehabilitation work which was available and which he was qualified to perform, located at Mississippi State Hospital, Whitfield, Mississippi. The board further declined to reopen his classification and classify him anew.

"FOR THE LOCAL BOARD:
/s/ Mrs. Virginia R. Hall
　　　Mrs. Virginia R. Hall, Clerk
"This meeting held 14 October 1965 in the office of Local Board No. 26, Gulfport, Mississippi"

dence to support such determinations. Decisions of local boards are final and the courts are not to weigh the evidence to determine whether the classification made by local boards is justified, for their decisions made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no "basis in fact" for the classification which it gave the registrant. The registrant bears the burden of clearly establishing his right to the ministerial exemption. The Selective Service Act requires that such a person must be a regular minister of religion and one "who is recognized by such church, sect, or organization as a regular minister." (50 U.S.C. App. § 466(g)(2).) Therefore, there must be regularity of religious activities, a vocation rather than an avocation, and a recognized standing as a minister to a congregation or leader of a group of lesser members of registrant's faith. See generally McCoy v. United States, 5 Cir., 1968, 403 F.2d 896; Camp v. United States, 5 Cir., 1969, 413 F.2d 419; Clay v. United States, 5 Cir., 1968, 397 F.2d 901; Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946); Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953); Wood v. United States, 5 Cir., 1967, 373 F.2d 894, reversed on other grounds, 389 U.S. 20, 88 S.Ct. 3, 19 L.Ed.2d 20 (1967); Matyastik v. United States, 5 Cir., 1968, 392 F.2d 657; Greer v. United States, 5 Cir., 1967, 378 F.2d 931; Foster v. United States, 5 Cir., 1967, 384 F.2d 372; Jones v. United States, 5 Cir., 1968, 387 F.2d 909; Fitts v. United States, 5 Cir., 1964, 334 F.2d 416.

We have carefully examined the facts in this case in light of the above principles of law, and we are convinced that there was not only a "basis in fact" for the local board's denial of a ministerial exemption to appellant, but that the board's findings were correct. The record indicates that the board gave patient and deliberate consideration to appellant's case over a long period of time, and that it considered all of the applicable facts. Prior to receiving the November 2, 1965 notice to report for civilian work, the only supporting evidence which appellant furnished the local board of his ministry were several written statements from fellow Jehovah's Witnesses that he was spending 30 to 40 hours per month in the ministry as a Vacation Pioneer, assistant to the Magazine-Territory Servant and attendant at the Congregation Book Study and Theocratic Ministry School once a week. All of these statements were considered by the board at its October 14, 1965 meeting, as they had at the September 15, 1965 meeting as well. By definition, Vacation Pioneers are not regular ministers of the Watchtower Society. They are on the Pioneer List temporarily, as we said in McCoy v. United States, supra, 403 F.2d at 901. The Superintendent of Ministers and Evangelists of the Watchtower Society, T. J. Sullivan, described a Vacation Pioneer appointment as follows: "It is an arrangement whereby persons can engage in the Pioneer ministry for shorter periods, such as when one is on vacation or when one is free for a month or two or longer and can engage in the Pioneer ministry." We also pointed out in *McCoy*, supra at 901, that according to a memorandum to the National Selective Service Appeal Board by Hayden Covington, General Counsel of Jehovah's Witnesses, the Watchtower Society would not contend for a IV–D classification for Jehovah's Witnesses except for those who qualify as Pioneers and as a Congregation Servant and who are devoting their time to ministerial work sufficiently to claim it as their vocation rather than their avocation. The Pioneers to which Mr. Covington referred are a Regular Pioneer who is required to spend an average of 100 hours per month or a total of 1,200 hours annually in ministerial work, and a Special Pioneer who is required to put in an average of 150 hours per month. Thus Robertson, a Vacation Pioneer, did not qualify for the ministerial exemption even within the hierarchy of that religious sect. His situ-

ation was therefore similar in that respect to that of *McCoy*. See McCoy v. United States, supra at 901. Nevertheless, independently of this consideration, the local board reviewed all of the facts pertaining to Robertson's case at the September 15, 1965 meeting and again at the October 14, 1965 meeting, at the latter of which appellant Robertson was personally present and Colonel Weeks of the State Selective Service Headquarters was also in attendance. The minutes of the October 14, 1965 meeting clearly show that the local board reviewed, as it was its duty to do, all of the facts pertaining to appellant's "preaching activities" and that it reviewed the photostatic copy of the Vacation Pioneer Appointment as well as letters of friends and religious brothers concerning appellant's ministerial activities. It is contrary to the evidence of record, therefore, to say that Robertson's request for a ministerial exemption was denied solely due to the fact that he was only a Vacation Pioneer. Denial of the IV–D classification was based on all of the facts and circumstances which the board believed were insufficient to justify such a classification. We are convinced from the evidence of record that the local board considered all of the facts and circumstances of appellant's case which they received from appellant, together with copies of Vacation Pioneer Appointments and letters of fellow Jehovah's Witnesses attesting to the extent—limited though it was—of his ministerial activities. The evidence fell far short of substantiating a full-time ministry as a vocation for appellant. None of the Vacation Pioneer Appointments to Robertson constituted a certificate that he was spending 100 hours per month in the ministry. One hundred hours was a goal toward which a Vacation Pioneer aspired. The two-month appointment dated September 23, 1965 stated in part: "Arrange to devote at least 100 hours to the ministry each month of your vacation pioneer service." It was likewise apparent that appellant did not have a recognized standing as a minister to a congregation or leader of a group of lesser members of his faith, which is critically important and necessary under the Selective Service law. McCoy v. United States, supra at 901; United States v. Hull, 4 Cir., 1967, 391 F.2d 257. We are satisfied, therefore, that a "basis in fact" existed for the denial of ministerial exemption claimed by appellant, and that it was established not from any single fact or circumstance as controlling but from the record as a whole. Cf. Swaczyk v. United States, 1 Cir., 1946, 156 F.2d 17, 19.

■ Nor was the local board required to reopen appellant's classification pursuant to his written request of November 8, 1965 (six days after the November 2, 1965, Order to Report for Civilian Work). The local board considered the documents attached to this letter, but did not believe there was any new evidence. Selective Service Regulations, 32 C.F.R. § 1625.2,[2] provide that a local board *may*

---

2. The full text of the regulation reads as follows:

"§ 1625.2 When registrant's classification may be reopened and considered anew.

"The local board may reopen and consider anew the classification of a registrant (a) upon the written request of the registrant, the government appeal agent, any person who claims to be a dependent of the registrant, or any person who has on file a written request for the current deferment of the registrant in a case involving occupational deferment, if such request is accompanied by written information presenting facts not considered when the registrant was classified, which, if true, would justify a change in the registrant's classification; or (b) upon its own motion if such action is based upon facts not considered when the registrant was classified which, if true, would justify a change in the registrant's classification; provided, in either event, the classification of a registrant shall not be reopened after the local board has mailed to such registrant an Order to Report for Induction (SSS Form No. 252) or an Order to Report for Civilian Work and Statement of Employer (SSS Form No. 153) unless the local board first specifically finds there has been a change in the registrant's status resulting from circumstances over which the registrant had no control."

reopen and consider anew the classification of a registrant upon his written request "if such request is accompanied by written information presenting facts not considered when the registrant was classified, which, if true, would justify a change in the registrant's classification." The same regulation also provides, however, that the classification shall not be reopened after the local board has mailed to the registrant an Order to Report for Civilian Work "unless the local board first specifically finds there has been a change in the registrant's status resulting from circumstances over which the registrant had no control." There were, of course, no changed circumstances over which the registrant had no control which might have brought about a change in his status. For this reason the local board had no authority under the circumstances to reopen the registrant's classification after the order to report for civilian work had already been mailed. See United States v. Arthur C. Banks, III, 5 Cir., 1969, 413 F.2d 435. Nor was the board required by the circumstances of the case to exercise its discretion to reopen the classification as a result of information submitted by the registrant in his personal appearance before the board on October 14, 1965, or thereafter on October 18, 1965, when he filed a copy of the Vacation Pioneer Appointment for the period September 1 to October 31, 1965 with the board. The board was already familiar with his Vacation Pioneer status, a temporary ministry, and with the facts which surrounded it. Registrant had not made out a prima facie case for reopening of his classification. None of the evidence submitted by the registrant was sufficient to warrant reclassification of registrant. The board, therefore, had no duty to reopen his case, and did not abuse its discretion in declining to do so. Nothing we said in McCoy v. United States, 5 Cir., 1968, 403 F.2d 896, requires a different result—to the contrary, the conclusion we reach here is in accord with the principles and holding in *McCoy*.

■ Proceedings before a draft board are not stages in a criminal prosecution, and there, therefore, is no merit to appellant's contention that Selective Service Regulations are constitutionally deficient under the Fifth and Sixth Amendments in denying the right to assistance of counsel, to compulsory attendance and confrontation of witnesses, or to silence and freedom from incrimination in such proceedings. McCoy v. United States, 5 Cir., 1968, 403 F.2d 896, 904; Merritt v. United States, 5 Cir., 1968, 401 F.2d 768, 769.

The judgment of the panel of this Court is therefore reversed, and the judgment of conviction entered in the District Court is affirmed.

BROWN, Chief Judge, with whom COLEMAN, Circuit Judge, joins, Specially Concurring: I do not detract from my full concurrence in the Court's opinion and decision, but I think these comments are in order concerning the dissent of Judge Godbold.

Vague as it is (See Note 1 of the dissent), the Statute extends ministerial exemption only to those who are "regular or duly ordained ministers of religion." 50 U.S.C.A. App. § 456(g) and § 466(g).

Similarly, broad as it is, of necessity this means a minister of some organized sect or faith. The law, because of the First Amendment, cannot look into or weigh what that faith believes, preaches or communicates. But the one to whom Congress extends the exemption has to be a "regular or ordained" minister of that body.

It is not, therefore, administrative or judicial abdication to determine on the *basis* of that sect's *standards* whether that person qualifies.[1] An Episcopalian

---

1. It does not necessarily work both ways. On spiritual grounds the sect may regard all adherents as "ministers". Actually Calvinists do so under the Westminster Confession of Faith's concept of the Priesthood of Believers. But, as with

must qualify as an Episcopalian, a Baptist as a Baptist, a Jew as a Jew, a Muslim as a Muslim. If the sect limits those it regards as "regular or duly ordained ministers" to persons having specified qualifications, then that is the standard against which the law judges the exempt or non-exempt status of the registrant.[2]

If, claiming to be of the Lutheran faith, the applicant does not meet its standards, he does not qualify as a Lutheran minister and the exemption is not available no matter how devout he is or how important or effective is his work in advancing the interests of that faith.

These principles are illustrated by considering the standards imposed by my own faith, which happens to be Presbyterian. By its Book of Church Order [3]

Jehovah's Witnesses, the law requires that to qualify the person have duties, work, and responsibilities as a leader, not just as a practitioner. See, e. g., Fitts v. United States, 5 Cir., 1964, 334 F.2d 416, 421.

2. The codal definitions of duly ordained and regular ministers bear out this approach:

"(g) (1) The term 'duly ordained minister of religion' means a person who has been ordained, in accordance with the ceremonial, ritual, or discipline of a church, religious sect, or organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in public worship, and who as his regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization.

(2) The term 'regular minister of religion' means one who as his customary vocation preaches and teaches the principles of religion of a church, a religious sect or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization, as a regular minister."

50 U.S.C.A. App. § 466(g) (1), (2).

3. The Book of Church Order of the Presbyterian Church in the United States, revised and reenacted by the 1945 General Assembly. Its historical roots are described in the preface written by the late Reverend Walter L. Lingle, one of the denomination's great scholars, preachers and teachers:

Our Book of Church Order has a long and notable line of ancestors. John Calvin wrote the first modern Presbyterian Book of Order for the church at Geneva in 1542.

John Knox sat at the feet of John Calvin for several years, and then returned to Scotland and wrote the first "Book of Discipline" for the Presbyterian Church of Scotland, in 1560. The whole history of Presbyterian church government in Scotland goes back to this first "Book of Discipline."

The Westminster Assembly, which met in London in 1643, wrote not only our Confession of Faith and Catechisms, but also "The Form of Presbyterian Church Government." The Presbyterian Churches of England, Scotland, and Ireland adopted this Westminster Form of Government.

When our Presbyterian forefathers came to America they brought with them the Westminster "Form of Presbyterian Church Government," and it became the basis of Church law in the American Presbyterian Church.

The first General Assembly of the Presbyterian Church in America was organized in 1789. The General Synod in preparing for the organization of the General Assembly practically rewrote "The Form of Presbyterian Church Government" in 1788, in order to adjust it to the conditions in America. This new book was called "The Form of Government and Discipline of the Presbyterian Church in the United States of America." It was revised a number of times prior to 1861, when the Southern Presbyterians withdrew and formed The Presbyterian Church in the United States.

When the General Assembly of the Presbyterian Church in the United States was organized on December 4, 1861, it adopted the Form of Government and Discipline which had been in use since 1788. In 1863 our General Assembly took steps to revise this Form of Government and Discipline with the result that a thoroughgoing revision was

it prescribes with great precision the standards one must meet to qualify as a minister.

These standards call for approval by Presbytery of candidates for the gospel ministry,[4] the licensure of candidates,[5] the election of pastors,[6] and the ordination and installation of ministers.[7]

One claiming to be a "regular or duly ordained" Presbyterian minister would have to show compliance with these requirements. Without question this proof would usually take the form of a properly authenticated certificate of the Moderator or Clerk of Presbytery and perhaps the Clerk of the Session [8] of the congregation of which he is pastor. And

adopted in 1879. A great many amendments were added during the next forty years.

In 1921 our General Assembly took steps to revise our Book of Church Order again. Another thoroughgoing revision was proposed by the Committee on Revision, adopted by the General Assembly, approved by a large majority of the Presbyteries, and enacted into law by the General Assembly of 1925.

While our present Book of Church Order is the result of numerous revisions, it still contains many phrases, sentences, and paragraphs which are found in "The Form of Government and Discipline of the Presbyterian Church in the United States of America," which was first adopted in 1788.

This brief sketch shows that our Book of Church Order goes back through a long and noble line of ancestors to the days of John Calvin. We also believe that in its basic principles it goes back to the Holy Scriptures.

4. The Book of Church Order of the Presbyterian Church in the United States, Form of Government, Chap. XXII §§ 106–112.

5. This includes formal examination, propounding of prescribed questions, preaching trial sermons, etc.
Chap. XXIII, §§ 113–124. The formal educational requirements are exacting:
"115. A candidate for licensure shall be required to present a diploma with degree from a standard four-year college or university, or at least authentic testimonials of having successfully completed a regular course of academic studies. A candidate for ordination shall also be required to present a diploma from a theological seminary under the control of our Church, or one approved by the Presbytery and requiring not less than three years' work in residence for the conferring of a theological degree, or at least authentic

testimonials of having successfully completed a regular course of theological studies."
Chap. XXIII, § 115.

6. Chap. XXIV, §§ 125–136. Except for Temporary Supply, such pastor must have been ordained.

"126. The relation between a Minister and a church may be that of a Pastor, Associate Pastor, Assistant Pastor, Stated Supply, or Temporary Supply. All of these shall be ordained Ministers, except that Presbytery may approve licentiates, candidates, or laymen as Temporary Supplies."
Chap. XXIV, § 126.

7. Chap. XXV, §§ 137–145.
This includes examination trials by Presbytery covering educational qualifications, preaching a trial sermon, the formal congregational installation service, the preaching of a sermon "adapted to the occasion" (§ 140) by an appointed representative of Presbytery, the ordination questions propounded to the minister being installed (§ 140) and to the congregation (§ 141), the ceremony of laying on of hands (§ 142), after which the Ruling Elders and Deacons "come forward to their Pastor, and give him their right hand, in token of cordial reception and affectionate regard" (§ 143).

8. See for Clerks, Chap. XII, § 52 and especially § 54:
"54. A Clerk, or Clerks, shall be elected by the Session, the Presbytery, the Synod, and the General Assembly to serve for a definite period, as determined by the court. It is the duty of the Clerk, besides recording the transactions, to preserve the records carefully, and to grant extracts from them whenever properly required. Such extracts, under the hand of the Clerk, shall be evidence to any ecclesiastical court, and to every part of the Church."
See, for Presbytery and Session, Chaps. XV §§ 70–79 and XIV §§ 61–69.

undoubtedly a properly authenticated certificate of Presbytery that such person did not (for some specified reason) qualify as an ordained minister would itself be sufficient basis on which the Board could deny the exemption.

The only thing left in doubt is the standards prescribed by the faith. For Presbyterians the 1634 A.D. Westminster Assembly of Divines, with its slight updating, makes the twentieth century's war-plagued task easy. For Jehovah's Witnesses it may be more difficult depending on how precise the sect's standards are. For all this record reveals Colonel Weeks was correct in his statements, not about what the *law* says, but what Jehovah's Witnesses require.[9]

Of course, as Judge Godbold's dissent points out,[10] Courts have held that the exemption may not be denied simply on the lack of a Pioneer certificate. Presumably such holdings were on the factual basis that the record in each case showed that the sect would regard persons in a lower echelon as having the status of ministers of the sect. If the decisions were not so grounded, then each was a judicial determination of a status, which is both beyond the prescience too often erroneously ascribed to federal judges with life tenure and would involve judges in the intrinsic assessment of religious beliefs, dogma and practice, which—even with prescience or omni-prescience—is forbidden to judges by the First Amendment, as the Supreme Court so recently declared concerning the efforts of Georgia judges to ascertain sectarian standards of Presbyterians and then weigh compliance by the church's ruling bodies with them. Presbyterian Church v. Hull Memorial Presbyterian Church, 1969, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658.

If the dissent means that judges are to determine *who* qualifies as a minister for that sect, then, in my view, it is incorrect in saying that the "draft board cannot abdicate to the authorities of this sect, or to the general counsel of the sect, its duty to judge the claim for * * * exemption on the particular objective facts of the case.[11] 417 F.2d 451. Unless judging the objective facts is in terms of the standards prescribed by Jehovah's Witnesses for spiritual leaders coming within the congressional concept of "ministers" the Board, judges, and through them the sovereign, would be trespassing on the First Amendment by determining that in the judgment of the Board or reviewing court such a person ought to be looked on as a minister.

GODBOLD, Circuit Judge (dissenting:

With deference to my numerous colleagues I must record my disagreement. It seems to me quite clear that the Local Board, in considering whether Robertson was entitled to a ministerial classification, proceeded under an erroneous view of the law.

---

9. I would emphasize again as in Note 1, supra, that the sect determines the *minimum* qualifications for status as a minister. If the registrant cannot meet those, he is automatically out. The law may, and does, however, step in to determine whether one satisfying those minimum standards engages in activities, work, leadership, etc., which would come within the congressional intention of "minister". But, even as to that, the First Amendment crops up again to deny the Government—i.e. the Board—the power to rule out ministerial status on the ground of the Board's ideas about beliefs, their acceptability, etc.

10. See cases cited in Part I and also Part 3.

11. Perhaps even more questionable is note 3 (and related text) of the dissent which treats the "Watchtower Society's standards" as *evidentiary* only as though the Board (or reviewing court) can determine whether the registrant qualifies on some standards other than those of the sect. When that day comes the Board will have become the Grand Inquisitor and Madison's Remonstrance (See Appendix, Everson v. Board of Educ. of Ewing, 1947, 330 U.S. 1, 63, 67 S.Ct. 504, 535, 91 L.Ed. 711, 748) will be overshadowed and outshouted by militant opposition.

I recognize the difficulty faced by this Board, and others, composed of public-spirited laymen performing a vital national service. It has proved excruciatingly difficult to attempt to fit the Jehovah's Witness registrant into the pigeonholes of the statutory exemption for "regular or duly ordained ministers of religion," 50 U.S.C. App. § 456(g) and § 466(g) and the supporting regulations, 32 C.F.R. § 1622.43.[1] The lay boards look to the professional Selective Service staffs for guidance. And Selective Service, in search of an answer, has given weight to statements of position from counsel for the church,[1A] which focus the emphasis on the particular piece of paper—the certificate—given the registrant by the church, certifying him to hold a described place in the church hierarchy. It is understandably easy for the unarguable and concrete certificate to become the nexus, the last or controlling word, the convenient peg on which to hang the hat of decision.[2] That avoids the sifting and weighing of evidence which itself may be, as it was in this case, shifting and changing. But, as so often happens, the shortest way across proves to be the longest way around.

### 1. The governing law

The scope of judicial review of a selective service classification is narrow. But a classification made on the basis of an erroneous view of the law falls within the range of judicial scrutiny. McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); Sicurella v. United States, 348 U.S. 385, 75 S.Ct. 403, 99 L.Ed. 436 (1955); United States v. Tichenor, 403 F.2d 986 (6th Cir. 1968); United States v. Hagaman, 213 F.2d 86 (3d Cir. 1954) (en banc).

In the case of Jehovah's Witnesses, under whose doctrine every member is a minister, ministerial classification may be neither granted nor denied on the basis alone of a certificate given the registrant certifying him to hold a particular place in the church hierarchy. The Covington memorandum, see footnote 1A, *supra,* neither changes church doctrine nor makes "regular or ordained" ministers out of particular persons or classes from among the sect's "ministers." The draft board cannot abdicate to the authorities of this sect, or to the general counsel of the sect, its duty to judge the claim for * * * exemption on the particular objective facts of the case. In United States v. Tichenor, *supra,* the court held:

> We hold only that the local draft board cannot, solely on the basis that appellant is not certified as a "Pioneer", deny him such a classification,

[1]. See the statement of Judge Wisdom for this court in Wiggins v. United States, 261 F.2d 113 (5th Cir.) cert. denied, 359 U.S. 942, 79 S.Ct. 723, 3 L.Ed.2d 676 (1959), referring to the Jehovah's Witnesses who correspond to ministers in a conventional organized religion and received no salaries and must engage in secular work to earn sufficient funds to carry on their religious work.
"This situation is not adequately covered in the Act and Regulations. A draft board and a reviewing court are placed in the position of balancing the secular against the religious interests and activities of the registrant with uncertain guides at best and subject to conflicting philosophies of individual board members and judges in their approach to selective service."
261 F.2d at 115.

[1A]. Significant portions of the well-known 1958 memorandum from Hayden Covington, General Counsel for Jehovah's Witnesses, to the National Selective Service Board, appear in United States v. Stidham, 248 F.Supp. 822, at 839 n. 9 (W.D. Mo.1965).

[2]. Even the careful judicial mind slides easily from the concept of the Watchtower Society's standards (as exemplified in a certificate) as an evidentiary item of probative force to be considered by the board, and those standards as determinative of qualification for exemption under the Selective Service law and regulations. The majority opinion, says: "Thus Robertson, a Vacation Pioneer, did not qualify for the ministerial exemption even within the hierarchy of that religious sect."

but rather it must determine, on the basis of the evidence before it, whether he is a "regular or duly ordained minister" as defined by 50 U.S.App. § 466(g).

403 F.2d at 989. Accord: Cox v. United States, 332 U.S. 442, 450, 68 S.Ct. 115, 92 L.Ed. 59, 68 (1947) and Senate Report 1268, 80th Congress, 2d Sess., p. 13; United States v. Dillon, 294 F.Supp. 38 (D.Or.1968); United States v. Garcia, C.D.Calif. No. 1265–CD–Cr. No. 8956 [Jan. 31, 1968]; United States v. Smoke, S.D.Ohio, Cr. No. 8956 [Jan. 31, 1968]. Similarly, in Application of Kansas, 385 F.2d 506 (2d Cir. 1967) the Second Circuit held that the registrant "could not be denied a ministerial exemption solely on the ground that he was a 'cantor and musical director'."

In *Dillon, Garcia and Smoke* district courts acquitted Jehovah's Witnesses who had been denied IV–D classification because they were Vacation Pioneers rather than Regular Pioneers. In *Dillon* the court stated: "The fact that he [defendant] was classified as a 'Vacation Pioneer' and not a 'Pioneer' does not preclude him from obtaining a ministerial classification."

The government does not deny that a classification made under an erroneous view of the law is subject to judicial review. Nor does it deny the correctness of *Tichenor* and like cases. Rather it zeroes in on matters other than appellant's status as a Vacation Pioneer and asserts they are bases in fact for the Board's action.

### 2. The existence of an erroneous view of the law.

In the performance of his duties Colonel Shed Weeks, Chief, Administrative Division, Mississippi State Headquarters, Selective Service System, actively participated in appellant's case at many stages. He met and advised with appellant and his father and friends. He advised the Board in numerous instances. He attended appellant's meeting of October 14 with the Board. On August 27, 1965 at the written request of the Board, appellant, his father and two other Jehovah's Witnesses, conferred with Colonel Weeks to discuss appellant's request to be classified as a minister. The Clerk's report of the conference says:

Colonel Weeks pointed out that Robertson is not now eligible for such a classification [4–D] and explained the reason why and instructed registrant as to how he could qualify for a 4–D classification.

We need not guess at what the instructions were. In his testimony Colonel Weeks described what he told appellant. The emphasis was upon what Robertson must do to secure a Regular Pioneer certificate, or other "qualifying" certificate.

Q. Now, in connection with this conference that you had there, do you recall what conversation you had and what you talked about?

A. Well, the registrant discussed with me his position with the Watchtower Bible and Tract Society his previous activities. To the best of my knowledge he didn't have at that time no official position or he didn't know about his connection with his preaching activities. I discussed with him and the people who were with him what was necessary to be eligible under Selective Service regulations and I also pointed out to him what his duties would be to be eligible for a 4–D classification with the local Selective Service Board.

Q. *What did you tell him that would be required of him to qualify as a 4–D of* [sic] *the Board of the Selective Service?*

A. That he would have to have enough preaching hours *to qualify him as a regular pioneer preacher to obtain a regular pioneer certificate* from the Watchtower Bible and Tract Society.

Q. Was anything said to him about a congregational servant?

A. Also about a congregational servant after the other was explained to him.

Q. Was any other position explained to him?

A. Assistant congregational servant, and also the requirements required for that.

Q. Well now, what discussion did you have with him as to those qualifications that were required or how did that come about?

A. I advised him that he must be putting in enough time in his preaching activities to consider this as his vocation and must be preaching regularly *and I showed him the number of hours the Watchtower Society required before he would be eligible for a regular pioneer certificate.*

On either September 3 or 7, 1965 appellant delivered to the Board letters stating that he was a Vacation Pioneer and had applied to be a Regular Pioneer. The Clerk's report of this appearance at the Board says:

He is reported by his associates as being a Vacation Pioneer, *which apparently does not qualify him as being eligible for a 4–D classification.*

On September 8 Colonel Weeks wrote the Board:

I believe that in a very short while this registrant will be able to get the evidence as a Regular Pioneer, as he stated in my interview with him on August 27, that application had been made. I believe that it would eliminate quite a bit of unnecessary work to give the registrant at least fifteen days to submit this certificate * * *. If the registrant does submit a certificate from the Watchtower Bible and Tract Society certifying that he is a *Regular or a Special Pioneer,* then the local board may by justified in placing him in Class IV–D.

The September 14 meeting of the Board is discussed below.

These occurrences are consistent with Colonel Weeks' testimony describing Selective Service policy. On cross-examination this occurred:

Q. Is it your testimony, Colonel Weeks, that only one who is a regular pioneer minister is entitled to a ministerial exemption?

A. Our local boards consider persons who are congregation servants, assistant congregational servants,— pioneers [sic], and regular pioneers, being the criteria as applies under Section 1622.43 or Selective Service Regulations.

The Clerk of the Board testified to the regulations which the Board "had to go by." Part of her testimony was:

Q. Wasn't the instructions given to the Board [concerning the ministerial exemption] *only for a regular pioneer certificate?*

A. I believe there are two other uh, *titles that they may have and be qualified,* something about a congregational servant or something like that.[3]

And later:

Q. I'm talking about the vacation pioneer servant?

A. Well, a *vacation pioneer servant is not entitled to a 4–D classification.*

Under these criteria articulated by Colonel Weeks and the Clerk of the Board, the registrant in Wiggins v. United States, *supra,* should not have been accorded ministerial status at the hands of this court. He was a Book Study Conductor.

The position of Selective Service, as communicated by Colonel Weeks, is on record elsewhere as well. In a memorandum of April 9, 1964 to Mississippi local boards and clerks concerning Jehovah's Witnesses,[4] Colonel Weeks discussed the

---

3. Mississippi appears to recognize as qualifying for ministerial classification those who hold certificates as Congregational Servants, Assistant Congregational Servants and Regular Pioneers. See footnotes 4 and 6, infra, and accompanying text.

4. This memorandum is part of the record in this court in the companion case of McCoy v. United States, 403 F.2d 896 (5th Cir. 1968), which also concerned denial of IV–D classification by a Mississippi board.

report given by Colonel Daniel Omer, General Counsel of the Selective Service System, at a conference of State Directors of Selective Service in May, 1959.[5] Also he discussed a letter from an official of Jehovah's Witnesses and the 1958 memorandum from Hayden Covington. Colonel Weeks' memorandum states "it is felt" that Regular Pioneers and Special Pioneers meet the requirements of § 1622.43 of the Regulations for a IV–D classification but:

> "Vacation Pioneer appointment is only temporary, and *it does not meet the requirements* of the definition of a IV–D classification under the Selective Service regulations." [6]

In a letter of September 14, 1965 [7] (coincidentally, the date that appellant had his first meeting with his board) Colonel Weeks advised McCoy's board:

> The minimum requirement for a Regular or Special Pioneer will meet the criteria for a IV–D classification as defined under Section 1622.43 of the Regulations. A Vacation Pioneer will not meet this criteria because he is not preaching regularly as defined under Regulations.

If there is any doubt that the Board's various actions were taken pursuant to the erroneous understanding that a Regular Pioneer certificate was prerequisite,[7A] this which occurred on cross-examination of the Clerk, should dispel it:

> Q. Now, Mrs. Hall, in a letter dated September 17, 1965 addressed to Colonel Shed H. Weeks, document number 45, in the third paragraph, you asked Colonel Weeks to arrange a meeting immediately in order to resolve this matter as quickly as possible, why was it so urgent to get this young man to report, what was the great urgency?
>
> A. Well, he was overdue to go.
>
> Q. Was it possible that the Board was trying to head off this information about his being a pioneer—
>
> A. No, sir, the Board gave him time to get his pioneer certificate, they gave him some time.
>
> Q. Now, in these documents received from the Watchtower Society in his record, what did it show with respect to the amount of time he had to devote to the ministry as a vacation pioneer?
>
> BY MR. HAUBERG [United States Attorney]:
>
> If it please the Court, *the Vacation Pioneer is not in the Category that they said they would certify for a 4–D ministerial classification.*
>
> BY THE COURT:
>
> *I realize that,* but I'll let her answer.

The Clerk understood what the Board's requirement was. The United States Attorney understood it and in candor recognized it. The trial judge understood it.

This is the flood tide of evidence which my brother judges do not mention. My brothers adopt the government's argument that because appellant's file contained other factual data to which the Board's decision arguably can be related the use throughout of an erroneous standard of law becomes error without

---

5. See discussion, *infra*, of United States v. Duecker, W.D.Wis., 67–CR–78 [Apr. 22, 1968].

6. The erroneous approach of accepting the certificate as conclusive appears with respect to other types of certificates as well. Colonel Weeks' memorandum says: "The policy in Mississippi is to also consider Assistant Congregational Servants as qualifying for a IV–D classification."

7. This letter also is part of the record in this court in McCoy v. United States.
 In *McCoy* a member of his board testified that obtaining a Pioneer certificate was the "sole criteria" for a IV–D classification, that other information concerning congregation duties would not be sufficient because the Pioneer certificate was "the only one we would have been concerned with." The Clerk of McCoy's board testified to the same effect.

7A. No member of the Board testified.

injury. Heavy reliance is placed on excerpts from the reports of the Board meetings of September 15 and October 14. The report of the September 14 meeting does say the Board met and "registrant's file was studied by them carefully." But it says much more than this boilerplate. I set out in the margin the full report of that meeting sent to Colonel Weeks.[8] The Board suspected appellant of stalling *because it found he had applied for a Vacation Pioneer certificate and not a Regular Pioneer certificate, as Colonel Weeks had understood he was going to do,* and, under their interpretation of Board Advices [from Selective Service], other Memorandums [sic], and Regulations appellant could not qualify as a Regular Pioneer anyhow. The Board was traveling unwaveringly down the rabbit trail on which, through error wholly understandable, it had been set.

The report of the October 14 meeting, at which Colonel Weeks was present, says:

> Before discussing the type of work that the registrant should perform, the local board again reviewed the file concerning the registrant's preaching activities. The local board reviewed photostatic copy of Vacation Pioneer appointment of the registrant and letters of friends and brothers concerning the registrant's ministerial activities.

This is inconsistent with the testimony of Colonel Weeks himself, quoted above, of what local boards would consider. But even if the report is right and Colonel Weeks wrong, if the Board "considered" the Vacation Pioneer certificate alone, or other evidence, or the certificate plus other evidence, such "consideration" is not a valid basis in fact for the classification if conducted under an erroneous legal standard. To "consider" the file was meaningless if upon looking at the documents that made up the file the Board members thought that a Regular Pioneer certificate was the *sine qua non* to ministerial classification, or that a Vacation Pioneer certificate commanded denial, or that a Vacation Pioneer certificate was simply irrelevant.

### 3. The reach of the problem

The problem is not one alone for this Board and this registrant, or Mississippi boards and registrants. We do not know whether the misunderstanding reaches Selective Service in all the states. But we do know, as a minimum, from this case and those discussed in this opinion, that it has touched boards in Mississippi, Kentucky, Wisconsin, Ohio, Oregon and California. And we know, from Colonel Weeks' memorandum to Mississippi boards and clerks, that the misunderstanding has at least some roots in the National Selective Service System.[9]

---

8. "Local Board No. 26 convened on 15 September 1965 and subject registrant's file was studied by them carefully.
"After digesting the attached letter from the Watchtower Bible and Tract Society, dated 2 September 1965 and received by this board 14 September 1965, and from reviewing other statements and reports in his file, and from their interpretation of Local Board Advice No. 97 and other Memorandums and Selective Regulations, they were under the impression that this registrant had only recently applied for appointment as a vacation pioneer and had not, as he stated to you, made application for appointment as a regular pioneer, nor would he qualify if he had. They strongly suspect he is only stalling for time, or even possibly attempting to evade complying with Selective Service regulations requiring him to serve his two years civilian work in lieu of military service.
"They therefore directed that the two letters attached hereto, received by this board on 14 September 1965, be forwarded to you for your further information in this case with the request that a conference be arranged immediately with the registrant, the board, and a representative from State Headquarters in order to resolve this matter as quickly as possible."

9. And the courts themselves have aided in perpetuating the error. *E.g.,* United States v. Heljenek, 275 F.Supp. 579 at 581 (E.D.Pa.1967):

The Board found to have erred in *Tichenor* was in Kentucky. United States v. Hestad, 248 F.Supp. 650 (W.D. Wis.1965) concerned a Wisconsin board and the Wisconsin Selective Service headquarters. The district court directed a judgment of acquittal on a charge of refusal to report for work because the Board had improperly refused to reopen defendant's classification. Part of the new evidence furnished as the basis for reopening was the defendant's Vacation Pioneer certificate. The district judge said:

> This record, suggests, but does not make explicit, a theory which may have led the local board and the state headquarters of Selective Service to conclude that a prima facie case for ministerial classification had not been made out by this defendant. This theory is that only a "regular pioneer", as distinguished from a "vacation pioneer", in the Watchtower Society is entitled to 4–D classification.

248 F.Supp. at 654. He found two items in the record indicating that this theory may have been maintained. The first was an opaque notation by the secretary of the local board in connection with a meeting:

> Q. Board general in every CO's and the nation. Do [sic–due?] to have Pioneer Certificate or higher for a 4–D. (Neby).

248 F.Supp. at 655. The second element was a series of events which occurred after the order to report was mailed to defendant on December 18, 1964. In May, 1965 the defendant was appointed a Regular Pioneer. Responding to this appointment the State Selective Service headquarters wrote the board on May 12:

> Since his [defendant's] appointment as a Pioneer Minister was not effective until after he did not report for

civilian work, no action is required by your Local Board at this time.

The district judge noted that possibly the board's failure to reopen in December could not be challenged by subsequent events. But he added:

> However, the Administrative Officer's letter of May 12 supports the conclusion that the local board believed that a "regular pioneer minister", "or higher", is entitled to 4–D classification, but that other members of Jehovah's Witnesses are not.
>
> * * * * * *
>
> If such a standard was applied by the local board, and perhaps endorsed by the state headquarters, it was incorrect.

The widespread misconception is further exemplified by United States v. Dillon, 294 F.Supp. 38 (D.Or.1968). A Vacation Pioneer was classified IV–D. He was devoting at least 130 hours per month to the ministry and had been doing so for fourteen months. He spent only twenty-five hours per month in secular activities. The Board refused a ministerial classification. On appeal the Appeal Board unanimously reversed and classified Dillon as IV–D. The Oregon Selective Service Headquarters wrote the Appeals Board *and asked it to reconsider because Dillon was only a Vacation Pioneer, "which has not generally been considered a basis for Class IV–D."* The Board reconsidered and denied the ministerial classification. On prosecution for failure to report for civilian work the district judge found Dillon not guilty and pointed out Selective Service's error—"the fact that he [Dillon] was classified as a 'Vacation Pioneer' and not a 'Pioneer' does not preclude him from obtaining a ministerial classification." 294 F.Supp. at 40.

In United States v. Duecker, W.D. Wis. 67–CR–78 [Apr. 22, 1968], tried before the same judge who tried the *Hestad* case, *supra*, a Jehovah's Wit-

---

"Within the Jehovahs' Witnesses sect he [defendant] was a Book Study Conductor, a classification several stages be-

low Pioneer Minister, the lowest classification recognized by the Selective Service System for ministerial exemption."

ness was acquitted. A representative of the Wisconsin State Selective Service Headquarters had brought to the local board meeting a copy of the same "presentation" by the General Counsel of Selective Service to state directors, referred to in Colonel Weeks' memorandum to the Mississippi boards and clerks. See footnote 5, *supra*, and accompanying text. This official had marked the organizational chart, which was a part of the document, to indicate that Congregation Servants and Pioneers are entitled to IV–D classification but that those of "lesser" rank are not. Also the clerk's summary of a local board meeting showed a member inquired of defendant whether he was a "pioneer minister." The court commented:

> It is quite reasonable that those charged with the administration of the selective service system, and particularly those called upon to decide whether a ministerial classification is appropriate, should acquaint themselves with the organizational structure of various religious groups, and should ask a particular registrant whether he holds a religious title and, if so, what it is. However, there is a considerable danger of prejudicial error which must be carefully avoided. Registrants are to be classified on an individual basis according to their individual activities and circumstances, not upon the titles they may hold. For a local board or an appeal board to act upon the *theory* reflected by the pencilled annotations to the organizational chart in Exhibit 3 would be error invalidating the classification.

At best, with regard both to the standard and to what the Board thought it could consider, and did consider under that standard, the majority opinion is based on the sort of guesswork that the Supreme Court forbade in Sicurella v. United States, *supra*, 348 U.S. at 392, 75 S.Ct., at 406, 99 L.Ed. at 441:

> Here, where it is impossible to determine on exactly which grounds the Appeal Board decided, the integrity of the Selective Service System demands,

at least, that the Government not recommend illegal grounds.

Accord: United States v. Jakobson, 325 F.2d 409 (2d Cir. 1963); United States v. Stepler, 258 F.2d 310 (3d Cir. 1958); Shepherd v. United States, 217 F.2d 942 (9th Cir. 1954), rehearing denied 220 F.2d 855 (1955).

In Shepherd v. United States, *supra*, the Board was erroneously advised by the Department of Justice that the registrant, who believed in self-defense and theocratic war, was not entitled to conscientious objector status because he was not opposed to war in any form. The Ninth Circuit held:

> We recognize the possibility that the appeal board's action here may have been prompted solely by a consideration of the matters last referred to [the fact that the local board had made a classification after opportunity to observe the registrant's demeanor and pass on his credibility] and that the appeal board may have disregarded the Department's recommendation, or at any rate, that portion thereof containing the erroneous statement to which we have alluded. On the other hand, we cannot close our eyes to the strong probability that the appeal board, no doubt composed of laymen, would be much influenced by such a statement of the Department of Justice recommending that even if the registrant was sincere he could not be exempted because of his expressed beliefs relating to self defense and theocratic wars.

> \* \* \* \* \* \*

> We do not overlook the usual presumption that official action has been regularly performed. While it might be argued that in the absence of evidence one way or the other we must presume that the appeal board here disregarded the erroneous advice of the Department of Justice and relied exclusively upon the implied findings of the local board, that the registrant had failed to convince them of the genuineness of his religious convictions or of his sincerity, we find it

difficult to be persuaded in this, a criminal case, that such a presumption is sufficient to negative the likelihood that the board in fact relied upon the erroneous advice of the Department of Justice.

The present case cries for reversal more strongly than *Shepherd,* where the board arguably acted on evidentiary considerations of demeanor and credibility that were independent of the erroneous advice. The erroneous legal principles in the present case are inextricably part of the Board's action, relating as they do to the effect on Robertson's classification of the Vacation Pioneer certificate which the majority say *was* considered by the Board as part of all the facts before it.

This conviction should be reversed. The Board then can consider all the evidence under a correct legal standard and classify Robertson accordingly. The law then can take whatever is its appropriate course.

Therefore, I respectfully dissent.